*By order of the Bankruptcy Appellate Panel, the precedential effect
of this decision is limited to the case and parties pursuant to 6th
Cir. BAP LBR 8013-1(b). See also 6th Cir. BAP LBR 8010-1©.*

**File Name: 13b0009n.06**

**BANKRUPTCY APPELLATE PANEL OF THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| In re:  GEORGE BAVELIS, | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| QUICK CAPITAL OF L.I. CORP. AND TED DOUKAS, | ) | No. 13-8015 |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GEORGE BAVELIS, | ) | |
| | ) | |
| Appellee. | ) | |

Appeal from the United States Bankruptcy Court
for the Southern District of Ohio
No. 10-58583; Adv. No. 10-2508

Argued: November 5, 2013

Decided and Filed: December 19, 2013

Before: EMERSON, HARRIS and McIVOR, Bankruptcy Appellate Panel Judges.

_____

**COUNSEL**

**ARGUED:** Juan Carlos Zorrilla, HOLLAND & KNIGHT LLP, Miami, Florida for Appellant
SoCal.  Marion H. Little, Jr., ZEIGER, TIGGES & LITTLE, LLP, Columbus, Ohio, for Appellee.
**ON BRIEF:** Gary A. Goldstein, Baltimore, Maryland, for Appellant Doukas.  Marion H. Little,
Jr., Christopher J. Hogan, ZEIGER, TIGGES & LITTLE, LLP, Columbus, Ohio, for Appellee

_____

**MARCI B. McIVOR**. Bankruptcy Appellate Panel Judge.  In this appeal, Quick Capital of L.I. Corp. ("Quick Capital") and its owner, Ted Doukas, appeal an order entered by the bankruptcy court disallowing the claims filed by Quick Capital against the estate of debtor George Bavelis.[1] Appellants also appeal the bankruptcy court's finding that neither Mr. Doukas, nor any of his companies, have claims against Mr. Bavelis or his bankruptcy estate. Specifically, the bankruptcy court found:   (1) that the promissory note and loan agreement underlying Quick Capital's $14,000,000 claim were induced by fraud; (2) that neither Mr. Doukas, nor any of his companies, provided the promised consideration underlying the note and loan agreement; and (3) to the extent that any money was advanced pursuant to the note and security agreement, it was repaid in full by Mr. Bavelis.  The bankruptcy court also found that Mr. Doukas has no personal claim against Mr. Bavelis arising from violations of Florida securities statutes.  For the reasons in this Opinion, the Panel AFFIRMS the order of the bankruptcy court.

## I.  ISSUES ON APPEAL

The issues raised in this appeal are whether the bankruptcy court erred (1) in disallowing the claims filed by Quick Capital and (2) in concluding that Mr. Doukas and his related entities have no claims against debtor George Bavelis for violations of Florida securities statutes.

## II.  JURISDICTION AND STANDARD OF REVIEW

The Bankruptcy Appellate Panel of the Sixth Circuit has jurisdiction to decide this appeal. The United States District Court for the Southern District of Ohio has authorized appeals to the

---

[1] Throughout this Opinion, Quick Capital and Ted Doukas are collectively referred to as Appellants.  When appellant Ted Doukas is referred to in his individual capacity, he is referred to as "Mr. Doukas."

Panel, and none of the parties has timely elected to have these appeals heard by the district court. 28 U.S.C. §158(b)(6), (c)(1).  A bankruptcy court's final order may be appealed as of right pursuant to 28 U.S.C. § 158(a)(1).  For purposes of appeal, an order is final if it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment."  *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 798 (1989) (citation and quotation marks omitted).

In the present case, the order issued by the bankruptcy court giving rise to this appeal was certified as final pursuant to Fed. R. Civ. P. 54(b) ("[T]he court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.").

The bankruptcy court's legal conclusions are reviewed de novo.  *Caradon Doors & Windows, Inc. v. Eagle-Picher Indus., Inc. (In re Eagle-Picher Indus., Inc.)*, 447 F.3d 461, 463 (6th Cir. 2006). A bankruptcy court's decision that applies or interprets state law is a conclusion of law reviewed de novo.  *Official Comm. Of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.)*, 456 F.3d 668, 675 (6th Cir. 2006).  "De novo means that the appellate court determines the law independently of the trial court's determination."  *Treinish v. Norwest Bank Minn., N.A. (In re Periandri)*, 266 B.R. 651, 653 (B.A.P. 6th Cir. 2001) (citations omitted).  "No deference is given to the trial court's conclusions of law."  *Mktg. & Creative Solutions, Inc. v. Scripps Howard Broad. Co. (In re Mktg. & Creative Solutions, Inc.)*, 338 B.R. 300, 302 (B.A.P. 6th Cir. 2006) (citations omitted).

The bankruptcy court's factual conclusions are reviewed under a clearly erroneous standard. Fed. R. Bankr. P. 8013.  A finding of fact is deemed clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *Riverview Trenton R.R. Co. v. DSC, Ltd. (In re DSC, Ltd.)*, 486 F.3d 940, 944 (6th Cir. 2007) (citations omitted).  "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."  *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1166 (6th Cir. 1996).  Moreover, "due regard must be

given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed. R. Bankr. P. 8013. As explained by the U.S. Supreme Court:

> When findings are based on determinations regarding the credibility of witnesses, [Fed. R. Civ. P.] 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.... [W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.

*Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985) (internal citations omitted) (citing Fed. R. Civ. P. 52(a), whose language regarding deference to the lower court tracks Bankruptcy Rule 8013). *See also Hamilton v. Carell*, 243 F.3d 992, 997-98 (6th Cir. 2001). Thus, "[t]he clearly erroneous standard does not permit this Panel to substitute its assessments of credibility in place of the explicit findings made by the bankruptcy court." *Lyon v. Eiseman (In re Forbes)*, 372 B.R. 321, 334 (6th Cir. B.A.P. 2007).

## III. FACTS

Appellee George Bavelis was born in Greece in 1937 and emigrated to the United States in 1958. (Bankruptcy Court Trial Transcript at 451-53, hereinafter referred to as "Tr. at __"). In 1971, he began subleasing rental properties and thereafter purchased apartment buildings to lease. (Tr. at 453-54; 593). In 1973, he became a real estate broker. (Tr. at 454).

By 1975, Mr. Bavelis was engaged full time in the real estate business. (Tr. at 454). He organized Pella Company, a Columbus, Ohio, real estate investment and management company, and over the years formed more than 30 real estate investment partnerships operating in Columbus ("Ohio Partnerships"). (Tr. at 454-55). Mr. Bavelis personally guaranteed the mortgage debts incurred by the Ohio Partnerships. (Tr. at 465-66).

In 1996, Mr. Bavelis and other investors acquired Sterling Bank ("the Bank). (Tr. at 226-27; 456). A federally-chartered savings bank, Sterling Bank converted into a commercial bank chartered by the State of Florida in 2004. Mr. Bavelis was a director of Sterling Bank. He was also the chairman of the board, chief executive officer and president of its parent, Sterling Holding. At one point, Mr. Bavelis and members of the Bavelis family, directly and through trusts, owned between 52-55% of Sterling Holding. (Tr. at 177; 458).

In the early 2000s, a Sterling Bank lending officer suggested that Mr. Bavelis meet Mahammad Qureshi, a customer of Sterling Bank. The lending officer knew that both men had business interests in gas stations and thought the two might hit it off. Mr. Bavelis owned interests in six or seven gas stations. Mr. Qureshi held interests in over 100 gas stations. (Tr. at 458-59). From 2004 to 2007, Mr. Bavelis and Mr. Qureshi worked together to form limited liability companies for the purpose of investing in gas stations, office buildings and mixed-use real estate developments. They formed the following companies: (1) FLOMAQ, LLC ("FLOMAQ"), which was owned equally by FLOHIO, LLC ("FLOHIO"), an Ohio limited liability company in which Mr. Bavelis had an indirect interest, and MAQ Management, Inc. ("MAQ Management"), a company owned by Mr. Qureshi; (2) A successor in interest to FLOMAQ, FLOVEST, LLC ("FLOVEST"), formed in 2004 and owned equally by MAQ Management and FLOHIO; (3) BMAQ, LLC ("BMAQ"), formed in 2005 and owned equally by members of the Bavelis Family and Qureshi Family, LLC ("Qureshi Family"); (4) GMAQ, LLC ("GMAQ"), formed in 2006 and owned equally by Mr. Bavelis and Mr. Qureshi; and (5) George Real Estate Holdings, LLC ("George Real Estate"). The original members of George Real Estate were Mr. Bavelis and an individual affiliated with Mr. Qureshi. However, an unsigned, amended and restated operating agreement submitted by the parties suggests that GMAQ later became the sole member of George Real Estate. (The limited liability companies formed by Mr. Bavelis and Mr. Qureshi will hereinafter be collectively referred to as the "Bavelis-Qureshi LLCs.").

FLOVEST eventually became the owner of several properties, including a gas station in Indiana, a truck stop in Ohio, an office building in Florida, and several parcels of land in Florida.

5

It also began developing a shopping center in Lake Mary, Florida, which the parties referred to as the "Lake Mary Project." (Tr. at 463). BMAQ acquired four gas stations as well as land in Florida and Georgia. (Tr. at 462-63). In order to finance these projects, Mr. Bavelis and Mr. Qureshi caused FLOVEST and BMAQ to obtain loans from various lenders including Fifth Third Bank ("Fifth Third"), First Southern Bank ("First Southern"), Colonial Bank, N.A. ("Colonial Bank") and Heartland Bank. (Tr. at 463-64). The aggregate principal amount of debt owed by FLOVEST and BMAQ to the banks was approximately $21 million. Of this amount, the vast majority (more than $18 million) was the debt of FLOVEST.

Mr. Bavelis personally guaranteed (or otherwise had personal liability on) all of this debt (Tr. at 464-65), and Mr. Qureshi personally guaranteed at least some of it. GMAQ had no bank debt, so Mr. Bavelis had no guarantee obligations with respect to that company. (Tr. at 462). Mr. Bavelis had no personal obligations on the George Real Estate debt either.

The relationship between Mr. Bavelis and Mr. Qureshi was good for several years, but it began to deteriorate after Mr. Bavelis came to believe that Mr. Qureshi and MAQ Management were not providing a sufficient share of the funds required to service the debt of BMAQ and FLOVEST. (Tr. at 467-68). In order to service that debt, Mr. Bavelis borrowed money from FLOHIO and Pella Company.

In November 2008, Mr. Bavelis met Ted Doukas a/k/a Leftheris Doukas. They met because Mr. Doukas had obtained title (by quit claim deed) to several residential properties encumbered by Sterling Bank's security interests. Mr. Doukas had been negotiating with employees at Sterling Bank regarding the outstanding debt on the properties. The negotiations had not gone well, and Sterling Bank turned to the bank president, Mr. Bavelis, to negotiate with Mr. Doukas. Because Mr. Doukas and Mr. Bavelis were both of Greek descent, bank employees thought Mr. Bavelis might have more success in working with Mr. Doukas. (Bankruptcy court's Memorandum Opinion at 8-15, hereinafter referred to as "Op. at __"). After their initial meetings on the residential mortgage debt, Mr. Doukas became close friends with both Mr. Bavelis and his wife. (Op. at 12-16).

6

By the spring of 2009, Mr. Bavelis was under considerable financial pressure. The entities owned by Mr. Bavelis with Mr. Qureshi were struggling to service more than $18 million in bank debt. In addition, both Sterling Holding and Sterling Bank needed cash infusions. Approximately $12,000,000 was needed to capitalize the Bank. (Op. at 19).

In what was ostensibly an effort to assist Mr. Bavelis, Mr. Doukas agreed to negotiate with Mr. Qureshi. The goal was to make Mr. Qureshi contribute more money to service the Bavelis-Qureshi LLCs' bank debt. Mr. Doukas told Mr. Bavelis that without an ownership interest in one of the Bavelis-Qureshi LLCs, it would be difficult for Mr. Doukas to negotiate. Mr. Bavelis, therefore, assigned to one of Mr. Doukas's companies a 10% ownership interest in GMAQ, one of the entities owned by Mr. Bavelis and Mr. Qureshi. Mr. Doukas promised that the 10% interest would be transferred back to Mr. Bavelis once the negotiations were concluded. (Op. at 15-17).

In March 2009, in an effort to assist Sterling Bank, Mr. Doukas purchased 1200 shares of stock from Sterling Holding for $200,000. (Op. at 17). Mr. Doukas also promised he would open accounts at Sterling Bank and start depositing money into those accounts. (Op. at 17).

Among Mr. Bavelis's many financial problems were the personal guarantees on the FLOVEST debt owed to Colonial Bank and First Southern Bank. Mr. Doukas offered to help with this problem by acquiring the FLOVEST loans from those banks, thereby alleviating the pressure on Mr. Bavelis. The guaranties totaled approximately $13.7 million dollars. (Op. at 18). Mr. Doukas also agreed to start making deposits into Sterling Bank. (Op. at 18). Unfortunately, Mr. Doukas took no specific actions to refinance the debts or indemnify Mr. Bavelis on the obligations of the Bavelis-Qureshi LLCs.

In May 2009, Nemesis, an entity owned by Mr. Doukas, deposited $2,000,000 into accounts Mr. Doukas had opened at Sterling Bank. Mr. Doukas promised that he would continue to deposit between $80,000 and $120,000 per month into Sterling Bank accounts. (Op. at 20).

7

In June 2009, Mr. Doukas offered to help Mr. Bavelis with his estate planning, even though Mr. Doukas was neither a lawyer nor an estate planning professional. Mr. Bavelis had established a trust, the George A. Bavelis Trust, but it was not funded with any money. It was funded solely with shares of Sterling Holding, and Mr. Bavelis sought assistance in determining what assets should go into the Trust. (Op. at 23, 24).

Mr. Bavelis believed he did not have the ability to service any more debt. As noted above, Sterling Bank and Sterling Holdings were undercapitalized, and Colonial and First Southern Banks were in a position to enforce their guarantees against Mr. Bavelis.

Mr. Bavelis believed that Mr. Doukas was negotiating with Mr. Qureshi to resolve the disputes over the Bavelis-Qureshi LLCs. Mr. Doukas represented to Mr. Bavelis that Mr. Qureshi "was not taking [Mr. Doukas] seriously," (Tr. at 707:6-7) and that he needed more authority to negotiate effectively with Mr. Qureshi. (Tr. at 568; 706-07). On or about June 21, 2009, Mr. Doukas presented Mr. Bavelis with an agreement (the "R.P.M. Agreement") by which Mr. Bavelis would, in return for $50,000, transfer his "50% interest in GMAQ, to R.P.M. Recoveries, Inc. ("R.P.M."), a New York corporation of which Mr. Doukas was president." When he signed the R.P.M. Agreement, Mr. Bavelis believed that he was giving "Mr. Doukas a larger percentage so that [Mr. Doukas] can be able to be more effective." (Tr. at 707:7-9). Mr. Bavelis's understanding when he signed the R.P.M. Agreement was that the agreement was temporary and would be "coming right back to me . . . ." (Tr. at 717:13; Op. at 22).

Mr. Bavelis believed that Mr. Doukas would be able to assist him with all his financial problems. In June, 2009, Mr. Doukas proposed that Mr. Bavelis sign a loan agreement and promissory note with Quick Capital. Mr. Doukas was the principal and president of Quick Capital ("QC"). On June 22, 2009, Mr. Bavelis signed a note with QC (the "QC Note"). Mr. Bavelis signed the QC Note in his personal capacity and in his capacity as Trustee of the George A. Bavelis Trust. Mr. Doukas signed the QC Note as president of QC. The QC Note contained the following text:

$14,000,000.00    June 21, 2009    Franklin County, Ohio

8

The QC Note identifies the consideration as "FOR VALUE RECEIVED." It states that the interest rate is "fourteen (5%) per annum" and then provides that the amount of interest is $58,333.33 per month, which equates to 5% per annum. The principal balance of $14 million was to be due on June 21, 2014. The QC Note states that it "may not be changed or terminated orally" and also contains the following text, which falls short of being a sentence: "IT IS EXPRESSLY AGREED, that the said principal sum secured by this note shall become due at the option of the holder hereof on the happening of any default or event by which, under the terms of the Security Agreement securing this Note."

In addition to the QC Note, Mr. Doukas signed a loan agreement as the president of QC (the "QC Loan Agreement"). Mr. Bavelis signed it both in his individual capacity and as the trustee of the Trust. The QC Loan Agreement identifies and refers to Mr. Bavelis in this dual role collectively as "GAB." After naming the parties, the QC Loan Agreement sets forth two recitals:

> Whereas Quick has provided and will continue to provide consulting and management services in an effort to restructure various liabilities and troubled assets owned directly or indirectly by GAB; and

> Whereas GAB as security for the payment of these services rendered and to be rendered agrees to provide a security interest for Quick in various securities in the amount of Fourteen Million ($14,000,000) Dollars[.]

The QC Loan Agreement does not refer to the QC Note. The only reference in the QC Loan Agreement itself to any payment by GAB is the phrase "the payment of these services rendered and to be rendered," which appears in the second recital set forth above.

Following the recitals, Quick Capital "represents that it will make available to GAB the following corporations which can be used to collateralize loans during the restructuring and refinancing process: 4 Louden Ave Corp, Raelaur LLC, 2 Lisa Court Corp., and Aries Capital of L.I. Corp."

9

In addition, the QC Loan Agreement states that Quick Capital "shall tender the sum of Two hundred Thousand ($200,000) Dollars to George A. Bavelis which he will accept on behalf of himself and as trustee of George Bavelis Trust No. 1, dated October 18, 2004."

The QC Loan Agreement provides that the parties would enter into a security agreement (the "QC Security Agreement"). It also states that "[i]t is acknowledged by the parties that all fees have been earned on a flat rate basis, the sufficiency of the consideration by all parties is hereby acknowledged." The QC Loan Agreement contained a provision making New York law the governing law, followed by the signatures and notary blocks. (Op. at 26-29).

According to Mr. Bavelis, at the time he signed the QC Note, Mr. Doukas assured Mr. Bavelis that Mr. Bavelis would never be expected to make payments on the QC Note. Mr. Bavelis testified at trial: "[W]hen I gave him this note for $14,000,000 I said, 'Ted, you don't expect me to make payments for this thing?' He said, 'No, no, no, you don't need to make payments.'" (Tr. at 598:22-25).

Mr. Bavelis also testified at trial that Mr. Doukas represented that the QC Note and QC Loan Agreement (the "QC Loan Documents) would be returned when Mr. Doukas finalized Mr. Bavelis's estate planning. Mr. Bavelis testified: "He told me it would take three to four month when I signed this note, it would take me three to four months that I give those papers back to you, George." (Tr. at 584:9-12).

On June 22, 2009, Mr. Bavelis signed the QC Security Agreement on his own behalf and on behalf of the Trust. The QC Security Agreement states that "[f]or value received[,]" Mr. Bavelis individually and as trustee of the Trust grants to Quick Capital a security interest in certain shares in Sterling Holding and securities referenced in a schedule that is referred to as Schedule A. (QC security agreement ¶¶ 2, 4). The QC Security Agreement states that it "secures the payment and performance of: (a) all obligations pursuant to [the QC Loan Agreement and the QC Note]." (QC Security Agreement ¶ 3). Defaults would include, among other things, "another secured party or

10

judgment creditor exercis[ing], or attempt[ing] to exercise or giv[ing] notice of its intention to exercise its rights against the Collateral." (Op. at 34).

Mr. Bavelis never consulted his own attorney prior to signing the QC Loan Documents. (Op. at 26).

As consideration for Mr. Bavelis signing the QC Note, Loan Agreement and Security Agreement, Mr. Doukas agreed to do several things: (1) make assets owned by himself or his companies "available to secure loans to effectuate the restructuring of Mr. Bavelis's liabilities"; (2) purchase Bank stock on Bavelis's behalf and purchase non performing loans held by Sterling Bank, and (3) provide consulting and management services to Mr. Bavelis and/or Sterling Bank. (Op. at 34-37).

After a dinner at the Bavelises' Florida home in early July 2009, Mr. Doukas gave Mr. Bavelis a $250,000 check dated June 21, 2009. (Tr. at 720). Mr. Doukas testified that the amount of the check included the $200,000 that was to be advanced under the QC Loan Agreement (Tr. at 49:19-22) as well as $50,000 under the R.P.M. Agreement. (Tr. at 861; Op. at 31). The check was drawn on an account maintained by Nemesis, a company owned by Mr. Doukas.

At trial, Mr. Bavelis testified that he attempted to refuse the check. (Tr. at 594).

Within six months of receiving the $250,000, Mr. Bavelis paid the money back. Mr. Bavelis issued Mr. Doukas a check drawn on the account of Pella Financial Services in the amount of $100,000; the check was dated July 14, 2009, and posted on July 27, 2009. The memo line states "Return Loan." Mr. Bavelis also issued Mr. Doukas a check drawn on the account of Pella Financial Services in the amount of $150,000; that check was dated July 27, 2009, and posted on August 17, 2009. The memo line on that check also states "Return Loan." (Tr. at 595-98). Mr. Doukas refused to accept the checks personally, but Mr. Bavelis caused them to be posted to an account Mr. Doukas maintained at Sterling Bank. (Tr. at 594-98; Op. at 39).

11

By August 2009, it was clear that Sterling Bank was in serious trouble. On August 7, 2009, Mr. Bavelis, as chairman of the board of Sterling Holding, sent a letter to its shareholders (including Mr. Doukas), stating in part:

> Sterling Bank, like a high majority of the banks in Florida, has been coping with the troubled loans so far and a written agreement has been reached between the Bank, the Federal Reserve and the State of Florida that we must reserve additional funds for reserves and further increase our capital ratios even though we have always been in the "well capitalized" category. In an effort to comply with the regulators requests and increase our regulatory ratios to the unprecedented higher ratios, the Board of Directors unanimously approved raising $12,600,000 new capital, primarily from the existing shareholder[s] through the end of the month, on a prorata basis at $100 per share for Class A and $80 per share of Class B and any shareholder may purchase any additional Common Shares or Class A or Class B for the same pro rata after August 31, 2009. Class A Shares are voting and Class B are non-voting but the shareholder distributions of both classes of shares will be the same as soon as our bank begins distributing money again with the permission of our regulators which we hope to be sometime in a year or two.

Along with the letter Mr. Bavelis sent a subscription agreement, a confidential private placement memorandum (the "PPM"), and an annual report. (Tr. at 149-51). Like the other shareholders of Sterling Holding, Mr. Doukas was sent a copy of these materials, including the PPM. (Tr. at 150-51; 745:14-25). In addition to the letter and other materials, Mr. Bavelis specifically gave Mr. Doukas a copy of the PPM (Tr. at 745:14-25), and Mr. Bavelis discussed the PPM with Mr. Doukas. (Tr. at 746:3-14). The PPM provided a "Notice to Florida Residents" stating that the securities had not been registered and that all persons purchasing the securities in Florida had a three-day right of rescission under Fla. Stat. Ann. § 517.061(11)(a)(5). Specifically, the PPM stated, in all capital letters:

> THE SECURITIES HAVE NOT BEEN REGISTERED WITH THE FLORIDA DIVISION OF SECURITIES. ALL PERSON PURCHASING SHARES IN FLORIDA HEREUNDER HAVE THE RIGHT, PURSUANT TO SECTION 517.061(11)(a)(5) OF THE FLORIDA SECURITIES ACT, TO WITHDRAW HIS SUBSCRIPTION FOR THE PURCHASE, AND RECEIVE A FULL REFUND OF ALL MONIES PAID, WITHIN THREE (3) DAYS AFTER THE EXECUTION OF THE SUBSCRIPTION AGREEMENT OR PAYMENT FOR THE PURCHASE HAS BEEN MADE, WHICHEVER IS LATER. WITHDRAWAL WILL BE

12

WITHOUT ANY FURTHER LIABILITY TO SUCH PERSON. TO ACCOMPLISH THIS WITHDRAWAL, A SUBSCRIBER NEED ONLY SEND A CERTIFIED LETTER RETURN RECEIPT REQUESTED TO THE COMPANY AT THE ADDRESS SET FORTH IN THIS CONFIDENTIAL MEMORANDUM, INDICATING HIS INTENTION TO WITHDRAW.

Although Mr. Doukas did not sign a subscription agreement, during a telephone call on the morning of September 23, 2009, he informed an employee at Sterling Bank that he wished to purchase stock in Sterling Holding, referencing the price for the Class B shares. (Tr. at 149-56; 199-201). Around noon that same day, the Sterling Bank employee, Richard Moyle Fritz, sent Mr. Doukas an email confirming the substance of this conversation. (Tr. at 154-58). The email states:

> Mr. Doukas:
>
> Please confirm the following based on our phone conversation of this morning. I am transferring monies from the following accounts into Sterling BancGroup, Inc.
> $45,600 from . . . Lefteris Properties Corp.
> $199,275 from . . . Lefteris Ted Doukas
> $919,095 from . . . Nemesis of L.I. Corp.
> $500,030 from [a certificate of deposit issued to] . . .WKYA Holdings Corp.
> (This CD is currently pledged for a line of credit that will not be closed based on using the funds from this CD for purchasing company stock)
>
> The total amount being transferred into Sterling BancGroup, Inc. to purchase stock is: $1,664,000.00
>
> Please confirm that you agree and approve all of the above transactions.
>
> Thank you
>
> Moyle Fritz

(Tr. at 57-60).

In his email, Mr. Fritz twice stated that Mr. Doukas's funds were being transferred into a Sterling Holding account. The email did not indicate that the funds were being transferred on Mr. Bavelis's behalf. Mr. Fritz also twice stated that the funds were being transferred for the purpose

13

of purchasing stock in Sterling Holding; in one of those instances, Mr. Fritz made clear that the purpose was to "to buy company stock on your behalf." Mr. Fritz made no reference to a stock purchase on behalf of Mr. Bavelis. In response, Mr. Doukas sent the following email (spelling and syntax in original):

> Hi moyle I authorize you to tranferred the all the monies today except on my personal account you hold it for now so tranferred everything else except the personal and next week I will wire more money try to sent me the wire instructions too thanks confirm you received that email thanks Ted

Because Mr. Doukas also instructed Mr. Fritz not to transfer $199,275 from his personal account, the amount of funds transferred was $1,464,725. Mr. Doukas raised no issue with the statements in Mr. Fritz's email to the effect that the funds were being transferred to Sterling Holding for the purpose of purchasing stock on behalf of Mr. Doukas. (Tr. at 157:15-158:5). The $1,464,725 of funds were transferred to an account named "Sterling BancGroup, Inc." (Tr. at 159-61; Op. at 50-52).

Although Mr. Doukas purchased the shares in September 2009, he requested that the issuance of stock certificates be deferred until after he formed a trust similar to Mr. Bavelis's, at which time the certificates would be placed in the name of Mr. Doukas's trust. (Tr. at 608). Ultimately, the stock certificates were not issued until February 2010.

On February 4, 2010, Mr. Bavelis sent Mr. Doukas a transmittal letter dated September 23, 2009, enclosing a stock certificate, also dated September 23, for 18,309 shares of Class B stock in Sterling BankGroup, Inc. (Op. at 76). Mr. Doukas received the certificates on February 8, 2010. One week later, on February 15, 2010, Mr. Doukas sent a letter to Mr. Bavelis which sought to reject the certificates and assert that the money paid for the shares was part of the consideration for the QC Note. (Op. at 77).

In October, 2009, Mr. Bavelis requested that Mr. Doukas return the QC Loan Documents to Mr. Bavelis. Mr. Bavelis was concerned that if something happened to Mr. Doukas, Mr. Doukas's

14

heirs might not understand that no payments were expected under the QC Note. (Op. at 56, 57). The QC Loan Documents were not returned.

In the fall of 2009, Mr. Doukas was still representing to Mr. Bavelis that he was negotiating with Mr. Qureshi over how to service the debt owed by the Bavelis-Qureshi LLCs. Mr. Doukas represented that he had negotiated a deal with Mr. Qureshi, but in order to finalize the deal, Mr. Bavelis would need to assign his interest in FLOVEST (one of the Bavelis-Qureshi LLCs) to Nemesis (an entity owned by Mr. Doukas). (Tr. at 61). Mr. Doukas represented that the assignments were to give him leverage in negotiations and that the assignments would be returned once the negotiations were complete. (Tr. at 61). The testimony at trial from Mrs. Bavelis was as follows:

> Q. Did you hear any discussions between your husband and Mr. Doukas about your husband assigning any interest in any of the Florida operating companies and I define those as BMAQ, GMAQ, Flovest or George Real Estate?
>
> A. Yes, I did.
>
> Q. And please explain to the Court -
>
> A. Yes.
>
> Q. - what you recall hearing in that regard.
>
> A. I did hear them discussing that and I heard Doukas telling George, "You know, you give me, you sign these documents I will negotiate with Mahammad and after everything is done I'll just give you back the papers. It's a matter of dealing with this man and after I do that I'll just return the papers back." As a matter of fact he used a term, a Greek term . . . which means it's just between us, I'll just give it back to you.
>            . . . .
>
> Q. And when you say he indicated he would return the paper, return the paper when?
>
> A. After he had finished dealing with Mahammad Qureshi.

15

(Tr. at 401:21-402:22; 412; 428-32).

On December 16, 2009, Mr. Doukas handed Mr. Bavelis and Mr. Bavelis signed four agreements purporting to transfer membership interests in the Bavelis-Qureshi LLCs to Nemesis.

At the same meeting, Mr. Bavelis (as the manager of Bavelis Family, LLC) and Mr. Doukas (on behalf of Nemesis) signed an agreement titled "BMAQ, LLC, Members, Transferor's and Transferee's Consent and Approval of Transfer of Ownership" ("December BMAQ Agreement"). By the December BMAQ Agreement, Mr. Bavelis purported to transfer to Nemesis 100% of Bavelis Family LLC's membership interest in BMAQ. The Qureshi Family was named as a party on the first page of the December BMAQ Agreement, but neither Mr. Qureshi nor anyone else signed the December BMAQ Agreement on behalf of Qureshi Family.

In addition, Mr. Bavelis and Mr. Doukas signed an agreement titled "George Real Estate Holdings, LLC Members, Transferor's and Transferee's Consent and Approval of Transfer of Ownership" ("December George Real Estate Agreement"). Under the December George Real Estate Agreement, Mr. Bavelis purported to transfer a membership interest in George Real Estate to Nemesis. Mr. Qureshi was named as a party on the first page of the December George Real Estate Agreement, but he did not sign the agreement.

Finally, Mr. Bavelis, as manager of FLOHIO, and Mr. Doukas, as president of Nemesis, signed an agreement titled "FLOVEST LLC, Members, Transferor's and Transferee's Consent and Approval of Transfer of Ownership" (the "December FLOVEST Agreement"). By the December FLOVEST Agreement, Mr. Bavelis purported to transfer to Nemesis all of FLOHIO's right, title and interest in 100% of its membership interest in FLOVEST. The other member of FLOVEST, MAQ Management, was named on the first page of the December FLOVEST Agreement for the purpose of providing consent, but neither Mr. Qureshi, nor anyone else, signed the December FLOVEST Agreement on behalf of MAQ Management. Mr. Bavelis did not make Mr. Qureshi aware of the December Agreements, and Mr. Qureshi did not learn of them until some time later. (Op. at 64).

Mr. Bavelis received no cash or any other remuneration in exchange for the December Agreements. "The only things he wants is to be indemnified," Mr. Doukas testified. (Tr. at 852:10). Neither Mr. Doukas nor any of his companies provided Mr. Bavelis indemnification or any other value in exchange for the transfer of the membership interests in the Bavelis-Qureshi LLCs. (Op. at 66).

Between January and April 2010, it became clear to Mr. Bavelis that Mr. Doukas had not been successful in resolving the issues with the Bavelis-Qureshi LLCs or in resolving the issues with the undercapitalization of Sterling Bank. As Mr. Bavelis became aware that Mr. Doukas had made misrepresentations to Mr. Bavelis, the relationship between the two men ended.

The last time that Mr. Bavelis heard from Mr. Doukas was in a text message on February 22, 2010, which stated: "Let's sit down and settle our differences I don't think you want me to loose my money." (Tr. at 907-08). Mr. Bavelis did not respond to that final text. (Tr. at 908).

On June 10, 2010, the Board of Governors of the Federal Reserve System determined that, as of April 30, 2010, Sterling Bank was "significantly undercapitalized" and issued a prompt corrective action directive providing the Bank 30 days from date of directive to become adequately capitalized. Sterling Bank could not do so, and, in July 2010, Sterling Bank was taken over by the FDIC. (Tr. at 176; 456-57).

On July 20, 2010, Mr. Bavelis filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Mr. Bavelis then commenced this adversary proceeding by filing a complaint against several defendants, including Mr. Doukas, Nemesis, QC and R.P.M. After Mr. Bavelis commenced the adversary proceeding, QC filed a proof of claim in the amount of $1,667,791.10 for "Money Loaned" ($200,000 plus $1,467,791.10) and later filed the amended proof of claim in the amount of $14 million plus interest. Neither Mr. Doukas nor any of his companies other than Quick Capital filed a proof of claim against the Debtor's estate.

17

In Count Three of the Complaint, Mr. Bavelis requests, among other things, a declaratory judgment that the QC Note fails for lack of consideration, has been fully satisfied, is void, and should be rescinded based on fraudulent inducement. The affirmative defenses asserted by the Debtor thus constitute objections to the proof of claim pursuant to § 502(b) of the Bankruptcy Code ("Proof of Claim Objections"). *See Bavelis v. Doukas (In re Bavelis)*, 453 B.R. 832, 852 (Bankr. S.D. Ohio 2011).

After Mr. Bavelis filed a motion to bifurcate the adversary proceeding for hearing, the bankruptcy court entered an order bifurcating Count Three of the Complaint. Quick Capital filed a motion for summary judgment. The bankruptcy court entered an order deferring a ruling on the motion with respect to matters other than the proof of claim objections and denying the motion with respect to the proof of claim objections based on the existence of genuine disputes as to material facts.

In April 2012, the bankruptcy court held a four-day trial on the objections to the proof of claim and amended proof of claim. On July 9, 2012, the parties each submitted Proposed Findings of Fact and Conclusions of Law.

On March 28, 2013, the bankruptcy court entered a Memorandum Opinion on Debtor's Objection to Proofs of Claim of Quick Capital of L.I. Corp. The bankruptcy court disallowed Quick Capital's claim and amended claim and held that neither Ted Doukas nor any of his related entities had a prospective claim against Bavelis or his bankruptcy estate.

On April 10, 2013, Ted Doukas, Nemesis of L.I. Corp., Quick Capital of L.I. Corp. and R.P.M. Recoveries, Inc. filed the present appeal.

On September 13, 2013, the attorney for Mr. Bavelis, the attorney for Quick Capital and Mr. Doukas, and the attorney for Socal Capital, LLC, assignee of Quick Capital, signed a "Stipulated and

18

Agreed Order Joining Socal Capital LLC As a Party Defendant and Providing Rule 54(b) Certification for the March 28, 2013 Judgment." The Stipulations included the following provisions:

> 9. On August 7, 2013, it was disclosed to the [Bankruptcy] Court that Quick Capital had assigned its interests under the QC Loan Documents to Socal Capital LLC pursuant to an Assignment and Assumption Agreement dated April 6, 2011.

> 10. On August 16, 2013, Socal Capital filed a notice of assignment of the Proofs of Claim in the Chapter 11 Case pursuant to Bankruptcy Rule 3001(e)(2). On August 16, 2013, the Clerk for the Court issued its Notice of Filing Transferred or Assigned Proofs of Claim, which notice set September 6, 2013 as the last day for parties to object to Quick Capital's transfer of the Proofs of Claim to Socal. No objection was filed thereto and, as a result, Socal is substituted for Quick Capital with respect to the Proofs of Claim pursuant to Bankruptcy Rule 3001(e)(2).

> . . . .

> 13. With the assignment of the QC Loan Documents, Quick Capital has no claims against Mr. Bavelis or his estate . . . is not a party in interest as contemplated under Title 11 of the United States Code for any purposes in the Chapter 11 Case.

> 14. Provided the March 2013 Judgment is affirmed, Ted Doukas, or any entity affiliated with him does not have any claims against Mr. Bavelis or his estate and are not parties in interest as contemplated under Title 11 of the United States Code for any purposes in the Chapter 11 Case.

## IV. DISCUSSION

### A. Did the Bankruptcy Court Err in Disallowing Quick Capital's Claims?

The bankruptcy code expressly permits creditors to file proofs of claim. 11 U.S.C. § 501(a); Fed. R. Bankr. P. 3001(b). A proof of claim is deemed allowed unless an objection is filed. 11 U.S.C. § 502(a). If an objection is filed, a hearing is held by the bankruptcy court to determine whether the claim should be allowed or disallowed and the amount of the claim. 11 U.S.C. § 502(b); *see Pension Benefit Guar. Corp. v. Belfance (In re CSC Industries, Inc.)*, 232 F.3d 505, 509 (6th Cir. 2001) ("bankruptcy courts have the statutory authority to determine the *allowability* and *amount* of the claim").

During the claims allowance process, the burden of proof shifts between the parties. Initially, a creditor bears the burden of establishing its claim by filing a properly completed proof of claim. A properly filed claim constitutes "prima facie evidence of the validity and the amount of the claim." Fed. R. Bankr. P. 3001(f).

> If a party objects to the claim, the objecting party carries the burden of going forward with evidence to overcome the prima facie validity and amount of the claim. If the objecting party produces evidence to refute at least one of the allegations essential to the claim's legal sufficiency, the burden of persuasion shifts back to the claimant. The claimant ultimately bears the burden of proving the validity of the claim by a preponderance of the evidence.

*In re Hughes*, 313 B.R. 205, 208 (Bankr. E.D. Mich. 2004).

In the present case, because Quick Capital properly filed a proof of claim and an amended proof of claim, a prima facie case establishing the validity and amount of the claim was made. The bankruptcy court construed Count Three of debtor George Bavelis's adversary complaint (captioned "Declaratory Relief as to the June 2009 Note") as objections to the proofs of claim and the burden shifted to Mr. Bavelis. Mr. Bavelis's objections challenged the validity of the note and security agreement by asserting that their execution had been fraudulently induced and that the promised consideration was never provided. He further asserted that to the extent that any money was advanced under the note, the money had been repaid in full. The bankruptcy court agreed.

On appeal, Quick Capital and Mr. Doukas argue that the bankruptcy court erred in disallowing the claim filed by Quick Capital and disallowing any prospective claim by Mr. Doukas and/or entities related to him. Appellants generally raise no issues with regard to the bankruptcy court's analysis of the applicable law. They take issue primarily with the bankruptcy court's findings of fact.

*1. There Is Ample Evidence in the Record to Support the Bankruptcy Court's Findings That Mr. Bavelis Was Fraudulently Induced to Sign the Promissory Note and Security Agreement.*

Fraudulent inducement is an affirmative defense that renders a contract "unenforceable by the culpable party." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wise Metals Grp.,* 798 N.Y.S.2d 14, 16 (N.Y. App. Div. 2005); *Plantner v. Hoke*, 122 N.E.2d 298, 299 (Ohio Ct. App. 1954).[2] Under New York law, the elements of fraudulent inducement are "a representation of material fact, the falsity of that representation, knowledge by the party who made the representation that it was false when made, justifiable reliance by the plaintiff, and resulting injury[.]" *Centro Empresarial Cempresa S.A. v. America Movil,* 952 N.E.2d 995, 1000 (N.Y. 2011). The burden of proof by clear and convincing evidence rests with the party asserting the fraudulent inducement. *Sung v. Ramirez*, 467 N.Y.S.2d 486, 489 (N.Y. Sup. Ct. 1983).[3]

In this appeal, Appellants challenge the bankruptcy court's findings of fact regarding fraudulent inducement. Appellants assert that the bankruptcy court erroneously concluded that Mr. Doukas intentionally made four misrepresentations to Mr. Bavelis prior to or concurrent with the signing of the QC Loan Documents, specifically: (1) that Mr. Doukas would assist Sterling Bank,

_____

[2] Some, but not all, of the documents introduced at trial had a choice of law provision which required application of New York law. Because many of the documents were unclear as to what state's law governed interpretation of the document, and most of the documents were executed in Columbus, Ohio, the bankruptcy court analyzed the relevant documents under both states' laws. Because the law was so similar in both states, the bankruptcy court cited to both New York and Ohio law and declined to choose one or the other. This Opinion will cite to New York law in the body of the text and footnote the relevant Ohio law.

[3] Under Ohio law, the elements of the defense of fraudulent inducement are the same:

(1) an actual or implied false representation concerning a fact or where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction; (3) knowledge of the falsity of the representation or such recklessness or utter disregard for its truthfulness that knowledge may be inferred; (4) intent to induce reliance on the representation; (5) justifiable reliance; and (6) injury proximately caused by the reliance.

*Simon Prop. Grp., L.P. v. Kill*, 2010 WL 1266835, at *5 (Ohio Ct. App. Apr. 5, 2010). The burden of proof, by clear and convincing evidence rests with the party asserting fraudulent inducement. *Id.*

(2) that Mr. Doukas would assist Mr. Bavelis in resolving issues with Qureshi and the Florida LLCs, (3) that Mr. Doukas would assist in resolving the pending guarantee claims against Mr. Bavelis by Colonial Bank and First Southern Bank, and (4) that Mr. Doukas would plan Mr. Bavelis's personal estate. (Appellants' Br. at 42). Appellants contend that Mr. Doukas either satisfied or attempted to satisfy each promise, that to the extent the promises were not satisfied it was the result of Mr. Bavelis's own conduct, and that, in the case of the estate planning, Mr. Bavelis's reliance on any representations was not reasonable.

In a lengthy memorandum opinion issued after a four-day trial, the bankruptcy court conducted a thorough and thoughtful analysis of each element of fraudulent inducement. (Op. at 91-113).

The bankruptcy court reviewed the testimony and evidence presented at the hearing and carefully justified its findings, especially those relating to intent and credibility. [*See, e.g.,* Op. at 54 n.11, 73, 75-76). The bankruptcy court relied on both direct evidence as well as the reasonable inferences to be drawn from the direct evidence, fully explaining its reasoning on every element. With regards to the four representations specifically challenged by Appellants, the bankruptcy court found that: (1) despite representations by Mr. Doukas that he and/or his companies would assist Sterling Bank by making monthly deposits of at least $80,000 into Sterling Bank and purchasing the Bank's nonperforming loans, Mr. Doukas had neither the intent nor the ability to do either (Op. at 99); (2) despite promises by Mr. Doukas to help Mr. Bavelis resolve disputes relating to the Bavelis-Qureshi LLCs in a manner favorable to Mr. Bavelis, Mr. Doukas actually intended to take advantage of Mr. Bavelis and deprive him of assets (Op. at 97-98); (3) despite promises by Mr. Doukas that he would purchase loans from Colonial Bank and First Southern Bank in order to relieve Mr. Bavelis of liabilities arising from personal guarantees on those loans, Mr. Doukas failed to take any meaningful steps towards that end (Op. at 99-100); and (4) despite representations by Mr. Doukas that he had experience in estate planning and would take care of planning Mr. Bavelis's estate, Mr. Doukas did not have experience in estate planning and did not assist Mr. Bavelis in estate planning. (Op. at 100-01).

The bankruptcy court's findings of fact are specific and supported by testimony and documents in the record. The bankruptcy court specifically assessed the credibility of each witness and fully explained its findings regarding credibility. A review of the record and the bankruptcy court's detailed findings of fact discloses no basis on which this Panel could find that the bankruptcy court committed clear error in concluding that the appellee was fraudulently induced into signing the QC Note and Security Agreement.

2. *There Is Ample Evidence in the Record to Support the Bankruptcy Court's Findings That Bavelis's Performance under the Note Was Excused by Failure of Consideration.*

In addition to finding that Mr. Bavelis's performance under the QC Loan Documents was excused because of fraudulent inducement (performance being repayment of $14,000,000 claimed by Quick Capital in its proof of claim), the bankruptcy court also excused his performance for failure of consideration. The bankruptcy court correctly noted the distinction between lack of consideration and failure of consideration:

> Unlike a lack of consideration, which results in the failure to form a contract, "when there is a failure of consideration, there is originally a contract when the agreement is made, but because of some supervening cause, the promised performance fails." 3 *Williston on Contracts* § 7:11 (4th ed. 2012). That is, "[f]ailure of consideration exists when a promise has been made to support a contract, but that promise has not been performed. Where a failure of consideration exists, the other party is thereby excused from further performance." *Dawson Inc., Inc. v. Freund*, 2011 WL 1167487 [(Ohio Ct. App.),] at *5 (citations and internal quotation marks omitted). *See also* Ohio Revised Code Ann. § 1303.33(B) (West 2013) ("If an instrument is issued for a promise of performance, the issuer has a defense to the extent performance of the promise is due and the promise has not been performed"). New York law is to the same effect. *See* N.Y. U.C.C. Law § 3-408 (McKinney 2013) ("Want or failure of consideration is a defense as against any person not having the rights of a holder in due course . . . except that no consideration is necessary for an instrument or obligation thereon given in payment of or as security for an antecedent obligation of any kind . . . . Partial failure of consideration is a defense pro tanto whether or not the failure is in an ascertained or liquidated amount."); *Chase Nat'l Bank v. Chem. Corn Exch. Bank (In re Pascal's Estate)*, 146 N.Y.S.2d 364, 368 (N.Y. Sup. Ct. 1955) (holding a note unenforceable due to failure of consideration).

Op. at 89-90. The burden of proof to show a failure of consideration is on Mr. Bavelis by a preponderance of the evidence. *United Transp. Co. v. Glenn,* 232 N.Y.S. 373, 377 (N.Y. App. Div. 1929); *Berggren v. Berggren*, 96 N.Y.S.2d 435, 442 (N.Y. Sup. Ct. 1948).

In this appeal, the Appellants challenge the bankruptcy court's findings of fact regarding failure of consideration, asserting that the bankruptcy court erroneously concluded that there was a failure of consideration simply because Mr. Doukas failed to "resolve all the issues pertaining to Qureshi, Sterling Bank, and Bavelis' personal loan guarantees." (Appellants' Br. at 45). Appellants assert that there was no failure of consideration because "Doukas made his assets and cash available [to Bavelis], and purchased more than $2,200,000 of stock in a failing bank." *Id.*

The bankruptcy court carefully reviewed the evidence and testimony regarding consideration. It found that in addition to the $250,000 advanced to Mr. Bavelis, money that was repaid in full, Mr. Doukas made several other promises to Mr. Bavelis in consideration of the QC Loan Documents. Those promises were that: (1) Mr. Doukas would make assets owned by himself or his companies "available to secure loans to effectuate a restructuring of Mr. Bavelis's liabilities"; (2) in an effort to raise Bank capital, Mr. Doukas would purchase Bank stock on Bavelis's behalf and purchase nonperforming loans held by Sterling Bank; and (3) Mr. Doukas would provide consulting and management services to Mr. Bavelis and/or Sterling Bank. (Op. at 34-37).[4]

The bankruptcy court found that Mr. Doukas and his companies failed to keep any of those promises:

> As the evidence shows, Mr. Doukas never purchased shares in Sterling Holding on behalf of Mr. Bavelis, but instead did so on his own behalf. Likewise, Mr. Doukas never purchased the Colonial Bank and First Southern Loans or the nonperforming loans of Sterling Bank. The parties' understanding was that Mr.

---

[4] "Mr. Doukas testified that the consulting services were for three items: (1) to restructure the loans with Colonial Bank and First Southern; (2) to acquire nonperforming loans from Sterling Bank; and (3) to buy out Mr. Qureshi and indemnify Mr. Bavelis." Op. at 37 (references to hearing transcript omitted).

24

Doukas himself would use his assets to obtain loans in his name in order to purchase the Colonial Bank and First Southern loans, as well as the Sterling Bank nonperforming loans, but he never did so. Even if the deal had been that Mr. Bavelis could somehow pledge assets owned by Mr. Doukas or his companies, there would have been a failure of consideration because the evidence showed that no reasonable lender would have lent money to Mr. Bavelis based on the assets purportedly being made available by Mr. Doukas.

Mr. Doukas never indemnified Mr. Bavelis for his liability on the guarantees of the debt of the Bavelis-Qureshi LLCs or otherwise resolved the disputes with Mr. Qureshi in a manner favorable to Mr. Bavelis, never helped finalize Mr. Bavelis's estate planning and never provided any consulting and management services of value. The parties did not testify that monthly deposits of $80,000 to $120,000 formed part of the consideration for the QC Loan Documents, and even if they had done so, Mr. Doukas never made such deposits. Mr. Bavelis having repaid the funds actually advanced to him, any other obligation he would have had under the QC Loan Documents is unenforceable based on failure of consideration.

Op. at 90.

Appellants contend that the bankruptcy court's findings regarding failure of consideration were premised on a conclusion that Doukas "'guaranteed' that he would resolve all the issues pertaining to Qureshi, Sterling Bank, and Mr. Bavelis's personal loan guarantees" (Appellants' Br. at 45). The record, and the bankruptcy court's findings based on the record, disclose no such conclusion. Rather, the record fully supports the bankruptcy court's conclusion that Mr. Doukas's promises were the reason Mr. Bavelis signed the QC Note and Loan Agreement. The bankruptcy court's well-documented conclusion that none of the promises were kept is based on specific and credible evidence.

A review of the record and the bankruptcy court's detailed findings of fact discloses that there is no basis on which this Panel can find that the bankruptcy court committed clear error in concluding that Mr. Bavelis's performance under the QC Loan Documents was excused for failure of consideration.

25

*3. There Is Ample Evidence in the Record to Support the Bankruptcy Court's Findings Regarding Payment in Full.*

In concluding that Mr. Doukas and his related entities do not have a claim against Mr. Bavelis's bankruptcy estate, the bankruptcy court found that Mr. Bavelis had repaid in full any amounts loaned to him pursuant to the QC Loan Agreement. As the issuer of the QC Loan Documents, Mr. Bavelis bears the burden of proof on the affirmative defense of payment. *CIT Grp./Factoring Mfrs. Hanover, Inc. v. Supermarkets General Corp.*, 583 N.Y.S.2d 422, 423 (N.Y. App. Div. 1992).[5]

In this appeal, Appellants challenge the bankruptcy court's findings of fact regarding payment, asserting that the bankruptcy court erred in concluding that repayment of the entire amount lent to Mr. Bavelis by Nemesis (the only money that was actually advanced pursuant to the QC Loan Documents), whether $200,000 or $250,000, constituted payment in full by Mr. Bavelis. (Op. at 88). While conceding that Mr. Doukas did not lose any of the assets he made available to Bavelis, Appellants assert that the QC Loan Documents entitled them to payment of some amount as compensation for making assets available, whether Mr. Bavelis availed himself of those assets or not. As explained in the Appellants' Brief, "[t]he issue was not that the Note was paid, but rather what amount  pro-rated for the period of time when Mr. Doukas made his assets available  was due Quick Capital." (Appellants' Br. at 46).

In its Memorandum Opinion, the bankruptcy court specifically found that "the entire amount lent by Nemesis  whether $200,000 or $250,000  was repaid. Mr. Bavelis repaid the loan through Pella Financial Services, but that was of no more significance than Mr. Doukas using Nemesis to fulfill Quick Capital's obligation to lend the funds to Mr. Bavelis." (Op. at 88). Beyond that, the bankruptcy court concluded that Mr. Bavelis had no further obligations to Mr. Doukas because, as discussed above, no other consideration was provided.

---

[5] *Blackwell v. Int'l Union, U.A.W.*, 487 N.E.2d 334, 337 (Ohio Ct. App. 1984).

26

A review of the record and the bankruptcy court's detailed findings of fact discloses that there is no basis on which this Panel can find that the bankruptcy court committed clear error in concluding that Mr. Bavelis paid in full any and all amounts he owed Appellants pursuant to the QC Loan Documents.

**B.     Did the Bankruptcy Court Err in Concluding That Mr. Doukas and His Related Entities Have No Prospective Claims Against Mr. Bavelis for Violations of Florida Securities Laws?**

At the conclusion of the trial, Mr. Bavelis and Mr. Doukas filed proposed findings of fact and conclusions of law. Mr. Doukas requested that the bankruptcy court make the following findings:

> 121. Pursuant to Fla. Stat 51.061(11), sale of the Sterling BancGroup stock provided Doukas with a three-day right of recession.

> 122. Florida Statute 517.211 sets forth the remedies available in case of the unauthorized sale of securities. The section states:

> > "Each person making the sale and every director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, *is jointly and severally liable to the purchaser in an action for rescission if the purchaser still owns the security, or for damages if the Plaintiff has sold the security*." (Emphasis added)

> 123. Doukas made a timely rescission demand and neither Bavelis nor Sterling BancGroup refunded the stock purchase price.

> 124. Therefore, even under the Bavelis theory of this case--that Doukas purchased stock in Sterling Bank and the funds were not an advance pursuant to the terms of the Loan Agreement--George Bavelis is personally liable, and Ted Doukas has a claim against Bavelis in the amount of $1,469,791.00 plus interest, costs and reasonable legal fees. (Fla. Stat. 517.211)

(Proposed Findings of Fact and Conclusions of Law, Adv. P. No. 10-2508, docket # 245).

In its Memorandum Opinion, the bankruptcy court found that Mr. Doukas purchased shares of stock in Sterling Bank on his own behalf rather than on behalf of Mr. Bavelis (as part of the consideration for the QC Loan Agreement). Because Mr. Doukas sought a finding in his proposed Findings of Fact and Conclusions of Law that Sterling Bank's sale of stock failed to fully comply with Florida securities statutes, the bankruptcy court also ruled on that issue. The bankruptcy court ruled that the sale complied with Florida securities statutes. Since the sale complied with Florida securities statutes, the bankruptcy court ruled that Mr. Doukas could not assert a claim against the officers or directors of Sterling Bank, including Mr. Bavelis.

In this appeal, Mr. Doukas contends that the bankruptcy court erred both in addressing the substance of the securities law claims and in holding that the claims are without merit.[6]

*1. The Bankruptcy Court Properly Considered Whether Mr. Doukas Had a Prospective Claim Against Mr. Bavelis Arising from Alleged Violations of Florida Securities Laws.*

Appellants assert that the bankruptcy court should not have considered the merits of any claim belonging to Mr. Doukas against Mr. Bavelis arising from alleged violations of Florida securities laws because those claims had not yet been filed. (Appellants' Br. at 13, ¶ 5). Appellants make this argument notwithstanding the fact that in paragraph 124 of their Proposed Findings of Fact and Conclusions of Law, they asked the bankruptcy court to find that "George Bavelis is personally liable, and Ted Doukas has a claim against Bavelis in the amount of $1,469,791.00 plus interest, costs and reasonable legal fees. (Fla. Stat. 515.211(6))."

The precise nature and amount of any legal obligations between Mr. Doukas, entities controlled by Mr. Doukas, and Bavelis, arising from the QC Note and Loan Agreement were at the heart of the bankruptcy court's four day hearing. Whether Bavelis owed Mr. Doukas any amount of money pursuant to the Quick Capital loan was exactly what the bankruptcy court was asked to

---

[6] Pursuant to paragraph 14 of the "Stipulated and Agreed Order Joining Socal Capital," Mr. Doukas has conceded that if the bankruptcy court's judgment is affirmed, he has no claims against Mr. Bavelis or his estate.

determine. However, even if disallowing Mr. Doukas's prospective claim was somehow found to be beyond the purview of the hearing, the invited-error doctrine precludes Appellants from challenging that ruling.

> The doctrine of "invited error" refers to the principle that a party may not complain on appeal of errors that he himself invited or provoked the court or the opposite party to commit. *See* 5 Am.Jur.2d § 713 (1962). The doctrine has been referred to as "a cardinal rule of appellate review," and federal appellate courts have applied the doctrine to a wide range of conduct. *Crockett v. Uniroyal, Inc.*, 772 F.2d 1524, 1530 (11th Cir. 1985); *see Gundy v. United States*, 728 F.2d 484 (10th Cir. 1984) (burden of proof); *Weise v. United States*, 724 F.2d 587 (7th Cir. 1984) (submission of evidence).

*Harvis v. Roadway Exp. Inc.,*, 923 F.2d 59, 60-61 (6th Cir. 1991) (and cases cited therein).

In the present case, Mr. Doukas sought a ruling from the bankruptcy court regarding the existence and amount of an obligation owed to him by Mr. Bavelis arising under Fla. Stat. 515.211 because he included a proposed finding of fact to that effect in a filing with the bankruptcy court. The bankruptcy court had no choice but to rule on the issue of whether Mr. Doukas had a claim in the amount of $1,469,791.00, separate from his claim of $14,000,000. By inviting the bankruptcy court to rule on this issue, Mr. Doukas cannot now complain that the bankruptcy court erred in ruling.

2.     *The Bankruptcy Court Properly Concluded That Mr. Doukas Has No Claim Against Mr. Bavelis under Florida Securities Laws Because the Stock Sale Was Exempt from Registration under Fla. Stat. § 517.061(11)(A).*

Even if it was proper for the bankruptcy court to consider the issue, Appellants assert the bankruptcy court erred in holding that Mr. Doukas has no claim against Mr. Bavelis arising from violations of Florida securities laws. Specifically, Mr. Doukas contends that the bankruptcy court erroneously found that the Sterling stock sale was exempt from statutory registration requirements and erroneously concluded that his attempt to rescind the purchase transaction was untimely.

The bankruptcy court's conclusion that the stock sale was exempt under Florida securities law is a legal conclusion which is reviewed under a de novo standard of review by this Panel. The bankruptcy court's conclusions that Sterling Holding disclosed all material information and that Mr. Doukas failed to rescind his purchase in a timely fashion, are mixed questions of law and fact. *Cf. TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S. Ct. 2126 (1976) ("The issue of materiality may be characterized as a mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts."); *Moecker v. Antoine*, 845 So. 2d 904, 907-10 (Fla. Dist. Ct. App. 2003) (using law and facts to analyze whether a buyer timely rescinded a securities purchase). The Panel reviews bankruptcy court's conclusions of law under a de novo standard and the bankruptcy court's findings of fact under the clearly erroneous standard.

a. <u>The Florida Securities and Investor Protection Act.</u>

Chapter 517 of the Florida Statutes (titled "Florida Securities and Investor Protection Act") is a comprehensive statutory scheme designed to protect the public from fraudulent and deceptive practices in connection with the sale of securities. Section 517.07 sets forth specific registration requirements for the sale of securities. Section 517.061 exempts certain securities from the registration requirements of § 517.07. At issue in the present case is § 517.061(11), which exempts:

> (11)(a) The offer or sale, by or on behalf of an issuer, of its own securities, which offer or sale is part of an offering made in accordance with all of the following conditions:
>
> > 1. There are no more than 35 purchasers, or the issuer reasonably believes that there are no more than 35 purchasers, of the securities of the issuer in this state during an offering made in reliance upon this subsection or, if such offering continues for a period in excess of 12 months, in any consecutive 12-month period.
> >
> > 2. Neither the issuer nor any person acting on behalf of the issuer offers or sells securities pursuant to this subsection by means of any form of general solicitation or general advertising in this state.

30

3. Prior to the sale, each purchaser or the purchaser's representative, if any, is provided with, or given reasonable access to, full and fair disclosure of all material information.

4. No person defined as a "dealer" in this chapter is paid a commission or compensation for the sale of the issuer's securities unless such person is registered as a dealer under this chapter.

5. When sales are made to five or more persons in this state, any sale in this state made pursuant to this subsection is voidable by the purchaser in such sale either within 3 days after the first tender of consideration is made by such purchaser to the issuer, an agent of the issuer, or an escrow agent or within 3 days after the availability of that privilege is communicated to such purchaser, whichever occurs later.

Fla. Stat. § 517.061(11)(a)(1)-(5). To be entitled to the exemption for non-registered securities, the offer and sale must comply with all five of the conditions set forth in this section. *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp. 1512, 1531 (M.D. Fla. 1989).

Appellants do not dispute that Chapter 517 of the Florida Statutes applies to the September 2009 Sterling Stock transaction. The parties also agree that the requirements of an exempt offering, as set forth in subsections (1), (2), and (4) were satisfied. Appellants assert that the sale failed to satisfy subsections (3) and (5) because the PPM did not comply with the statute's rescission provision and because Mr. Bavelis failed to provide full and fair disclosure of all information material to this transaction.

> b. The bankruptcy court properly concluded that the PPM satisfied Fla. Stat. § 517.061(11)(a)(5)'s rescission provision and that Mr. Doukas's rescission was untimely.

Mr. Doukas argues that the PPM failed to properly notify him of the rescission period for rescinding his stock purchase. He also argues that even if notice was sufficient, he rescinded his stock purchase in a timely manner. Florida Statute § 517.061(11)(a)(5) gives a purchaser of securities a three-day time period for voiding the purchase. The three-day period runs "from either

31

the first notice of the privilege or the first tender of consideration, which ever occurs last." *Barnebey*, 715 F. Supp. at 1531. The intent of the provision is to "fix for a purchaser identifiable events from which he can calculate the period in which he is allowed to void his purchase." *Id*. at 1532.

On August 7, 2009, Mr. Bavelis, in his capacity as chairman of the board of Sterling Holding, sent a letter to shareholders, including Mr. Doukas, explaining the need for additional capital for Sterling Bank. The capital was to be raised by the sale of stock by Sterling Holding. The letter was accompanied by a Private Placement Memorandum ("PPM") and a subscription agreement. The PPM provided that the securities had not been registered and that all persons purchasing the securities in Florida had a three-day right of rescission under Fla. Stat. Ann. § 517.061(11)(a)(5).

On September 23, 2009, Mr. Doukas had a conversation with a Sterling Bank employee, Moyle Fritz. In that conversation Mr. Doukas stated that he wished to buy the stock being sold by Sterling Holding. The conversation was confirmed with an email which is fully quoted in the "Facts" section of this Opinion. Later that day, Mr. Doukas transferred $1,464,725 to an account named "Sterling BancGroup, Inc." The transfer was to purchase shares of stock in Sterling Bank.

It is clear from the record that Mr. Doukas had notice that his right of rescission existed, because that right was fully explained in the PPM which was sent to shareholders on September 7, 2009. Mr. Doukas purchased the stock on September 23, 2009. Because Mr. Doukas had notice of the right of rescission and tendered consideration for the stock, his three-day right of rescission commenced on September 23, 2009, and ended on September 27, 2009. The bankruptcy court correctly concluded that Mr. Doukas was properly notified of his right of rescission and that he failed to exercise that right in a timely manner.

On appeal, Mr. Doukas makes two arguments as to why the bankruptcy court erred in its conclusion that he had failed to exercise his right to rescind. First, Mr. Doukas argues that the PPM

did not provide him with adequate notice of his right to rescind. His argument is based on *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp. 1512 (M.D. Fla. 1989)

In *Barnebey v. E.F. Hutton & Co.*, the purchasers of securities argued that a rescission provision in the stock offering was insufficient to provide notice of when the rescission period ended. That provision stated, in relevant part: "[i]f five or more residents of Florida subscribe for Units, each subscription will be voidable by each Florida subscriber within 3 days after submission of his Subscription Agreement to the General Partner." The subscriber mailed the subscription agreement to a third party who forwarded the subscription to a general partner. There was no mechanism to inform the subscriber of the date on which the subscription agreement would be submitted to a general partner. On these facts, the bankruptcy court found that the provision did not comply with the dictates of § 517.061(11)(a)(5):

> the statute allows that the time for voiding a purchase run from either the first notice of the privilege or the first tender of consideration, which ever occurs last. Both of those events are ones of which a purchaser would or should be aware, and from which a purchaser could easily calculate the running of the clock on his privilege. The provision in this offering memorandum purports to have the clock run instead from the submission of the subscription agreement to the general partner. This event is not one which a plaintiff would necessarily be aware of until after the fact.

*Barnebey,* 715 F. Supp. at 1531.

The facts of *Barnebey* are easily distinguishable from the facts of the instant case. In *Barnebey*, the issue was whether a subscriber would know the date which triggered his right to rescind. In the instant case, after receiving the PPM and subscription agreement, Mr. Doukas purchased the stock. The Florida statute is clear that the right of rescission runs from the date a subscriber was notified of the privilege *or* the tender of consideration. Under Florida law, once Mr. Doukas purchased the stock, the clock started ticking on his right to rescind. Mr. Doukas had to exercise his right of rescission on or before September 27, 2009.

Mr. Doukas also argues that even if there was proper notice of a subscriber's right to rescind a purchase of stock, he rescinded his purchase and therefore has a claim against Mr. Bavelis for

33

$1,469,791.00. Mr. Doukas argues that he repeatedly refused to accept the stock certificate which was issued to him in February, 2010, and his refusals to accept the stock certificate were a valid rescission of his purchase.

The bankruptcy court ruled correctly that Mr. Doukas's rejection of the stock certificate in February, 2010 was not a valid rescission of his purchase. Florida law is clear that the right to rescind expires three days after the later of the notice of the right of rescission or the tender of consideration. Mr. Doukas was given notice on September 7, 2009, and tendered consideration on September 23, 2009. To the extent that Mr. Doukas was attempting to rescind his purchase when he refused to accept the stock certificate in February, 2010, the attempt to rescind was untimely.

c. <u>The bankruptcy court properly concluded that all material information required to be disclosed under Fla. Stat. § 517.061(11)(a)(3) was properly disclosed</u>.

Section 517.061(11)(a)(3) requires that prior to the sale of exempt securities, "each purchaser or the purchaser's representative, if any, is provided with, or given reasonable access to, full and fair disclosure of all material information." In this appeal, Mr. Doukas asserts that at the time of the stock purchase, September 23, 2009, he "was not provided with information concerning (a) Sterling Holding's financial status, (b) its stock sales, or (c) the FDIC report on the gross negligence of the Sterling Board of Directors . . . ." (Appellants' Br. at 36). Mr. Doukas specifically argues that the PPM "contained misrepresentations concerning the dollar amount of the shares of stock already subscribed for by the officers and directors of Sterling Bank and Sterling Holding." (Appellants' Br. at 35).[7]

---

[7]According to Mr. Doukas, "[t]he PPM represented that for the $12,600,000 capital raise the FDIC required to recapitalize the bank and prevent its closure by the Federal Reserve, stock subscriptions had already accounted for both $7,000,000 or all $12,600,000." (Appellants' Br. at 35). In fact, according to Mr. Doukas, "other than Bavelis, who subscribed for $1,000,000 of shares in September 2009, no one but Mr. Doukas had subscribed for the Sterling stock." *Id.*

34

The record in this case discloses that in August, 2009, Mr. Doukas (and the other shareholders of Sterling Holding) were sent a letter from Mr. Bavelis informing them of the Bank's financial difficulties, explaining that the Bank had entered into an agreement with regulators, and that the Bank needed to raise additional capital. Included with the letter was a subscription agreement, the private placement memorandum, and an annual report. (Tr. at 150-51; 745-46; Op. at 50). The PPM included detailed financial information including copies of audited financial statements for both Sterling Holding and the Bank, as well as disclosures regarding the Bank's regulatory issues and a copy of a remedial agreement between the Bank, the Federal Reserve and state regulators. Additionally, both Mr. and Mrs. Bavelis warned Mr. Doukas that there were significant financial and regulatory issues facing Sterling Bank. (Tr. at 407-08; 507-09).[8]

The record shows that Mr. Doukas was provided with, or had access to, full and fair disclosure of all material information regarding Sterling Holding and Sterling Bank prior to purchasing the stock. He had been involved with Sterling Bank and its management for some time prior to the stock purchase, and any confusion regarding the disclosures regarding how much stock had been sold or was committed to being purchased could have easily been determined. Mr. Doukas had extensive information in hand and nearly unlimited access to additional information from Mr. Bavelis. In light of the record, the bankruptcy court correctly found that the section 517.061(11)(a)(3) exemption requirement was satisfied.

Based on a review of the law, the PPM issued by Sterling Holding on September 7, 2009, disclosed all material information regarding the purchase of stock in Sterling Bank. Based on a

---

[8]At the hearing, Mr. Bavelis testified:
"I talked to him all along where we stood with the bank and that we had to raise capital and we had to raise 12 million dollars in capital by June 2010. And we talked about this very specifically and I said, "We either invest the 12 million dollars or we don't invest any money at all because we're going to lose it." And he said, "George, don't worry about it. I have enough money of my own and I have enough friends and I have enough contacts, don't worry about it. I'll take care of that, I'll find the money."
(Tr. at 508-09; Op. at 19-20).

review of the facts, Mr. Doukas's attempt to rescind his purchase of the Sterling Bank stock was untimely. All the requirements necessary to establish that Sterling Bank was entitled to the exemption for non-registered securities have been met. Because all the requirements for exemption were met, and the bankruptcy court found that Mr. Doukas purchased the stock for himself, the bankruptcy court's ruling that Mr. Doukas does not have a claim against Mr. Bavelis for $1,469,791 should be affirmed.

## V. CONCLUSION

For the foregoing reasons, the bankruptcy court's decision is affirmed in its entirety.