845 So.2d 904 (2003)
Michael MOECKER, Appellant,
v.
Thomas ANTOINE, Donna Antoine, Magdalena Matthews and James M. Matthews, Appellees.
No. 1D02-0036.
District Court of Appeal of Florida, First District.
March 13, 2003.
*905 David E. Otero and Jacob A. Brown of Akerman, Senterfitt & Eidson, P.A., Jacksonville, for Appellant.
Thomas Antoine, Donna Antoine, Magdalena Matthews and James M. Matthews, appellees, pro se.
*906 VAN NORTWICK, J.
Michael Moecker (Moecker), who, pursuant to chapter 727, Florida Statutes (1997), is the assignee for the benefit of creditors of the assets of First Street Mortgage Corporation, an insolvent corporation, appeals an order overruling objections by Moecker to claims filed by Thomas Antoine, Donna Antoine, Magdalena Matthews and James M. Matthews, appellees. The appellees initially filed their claims below as shareholders of First Street, rather than as creditors. After Moecker filed objections to their claims, appellees filed notice of their rescission of their purchases of First Street stock and asserted revised claims as creditors. The trial court allowed the appellees' claims as unsecured, nonpriority claims based on its finding that the appellees had timely rescinded their purchases of First Street common stock pursuant to section 517.061(11)(a)5, Florida Statutes (1997). Moecker asserts that the trial court erred in allowing the appellees' claims, arguing that the appellees' rescission claims arose after the date of assignment and were therefore not allowable under section 727.112(1), Florida Statutes (1997), and that the appellees' rescission under section 517.061(11)(a)5 was untimely. For the reasons that follow, we affirm.

Background
Thomas Antoine and James Matthews were employees of First Street, which lent money for residential property buyers who did not generally qualify for bank or government-sponsored lending programs. In July 1998, jointly with their respective wives, they purchased shares of common stock in First Street in response to a solicitation made to First Street employees by the management of First Street. Mr. and Mrs. Antoine purchased .1718 share of common stock for a price of $125,000 while the Matthews purchased .0687 share of common stock for a price of $50,000. The stock sale was structured as a private placement, unregistered with the Securities and Exchange Commission or the State of Florida. On December 14, 1998, First Street and Michael Moecker & Associates, Inc.,[1] executed an assignment for the benefit of creditors. First Street was thereafter declared an insolvent corporation, and on December 15, 1998, Moecker filed a petition in the circuit court commencing a proceeding under chapter 727, Florida Statutes.
In February 1999, the Antoines filed a claim in the amount of $125,000 in the chapter 727 proceeding, expressly representing that the basis of the claim was "as shareholders." In April 1999, the Matthews similarly filed a claim as shareholders in the amount of $50,000. Moecker objected to the claims, asserting that because the appellees made equity contributions to First Street, not loans, they were not creditors. In October 2001, the Antoines and the Matthews filed in the circuit court proceeding notices of the rescission of their stock purchases pursuant to the rescission privilege provided by section 517.061(11)(a)5, Florida Statutes.
The assignees' objections were heard by the trial court and, following that hearing, the trial court entered an order allowing the appellees' claims. In the order under review, the trial court found that the October 2001 rescissions by the Antoines and Matthews were timely "because First Street Mortgage Corporation never communicated the right to rescind under § 517.061(11)(a)5, Fla. Stat., to the Claimants." The trial court reasoned that, because First Street had not informed the *907 Matthews and the Antoines of their rights to rescind the stock purchase pursuant to section 517.061(11)(a)5, their right to rescind had not expired. The trial court further ruled that, even though the Matthews and Antoines eventually gained actual knowledge of a rescission right, such knowledge, by itself, was not a sufficient basis for commencing the three day rescission period provided by section 517.061(11)(a)5. Finally, the trial court found that the appellees' claims arose prior to the filing date of the petition for assignment because their right to rescind existed at the time of filing. Thus, the claims were allowed as unsecured, nonpriority claims.
The issues presented in this appeal are issues of law. Thus, the standard of review is de novo. See Walter v. Walter, 464 So.2d 538 (Fla.1985); Rittman v. Allstate Ins. Co., 727 So.2d 391 (Fla. 1st DCA 1999).

Rescission under Section 517.061(11)(a)5
The federal Securities Act of 1933 requires that all securities sold or offered for sale in interstate commerce or through the mail must be registered with the United States Securities and Exchange Commission, 15 U.S.C. § 77e (1997), subject to certain exemptions, including an exemption for transactions not involving any "public offering." 15 U.S.C. § 77d(2). States have adopted similar registration requirements and exemptions, commonly called "blue sky" laws.[2] Under the Florida blue sky laws, the Florida Securities and Investor Protection Act provides:
It is unlawful and a violation of this chapter to any person to sell or offer to sell a security within this state unless the security is exempt under s. 517.051, is sold in a transaction exempt under s. 517.061, is a federal covered security, or is registered pursuant to this chapter.
§ 517.07(1), Fla. Stat. (1997).
It is without dispute that First Street did not register its offer or sale of common stock to the appellees and that the only issue raised here with respect to the offering concerns the rescission privilege included in the exemption provided by section 517.061(11)(a), Florida Statutes (1997).[3] This exemption "applies only if all five specified statutory conditions are established, *908 an issue upon which the parties relying upon the exemption ... bear the burden of proof." Weinberg v. Pennington, 462 So.2d 862, 863 (Fla. 3d DCA 1985); see also § 517.171, Fla. Stat. (1997).
When sales of securities are made to five or more persons in Florida, a fact not in dispute here, subparagraph 5 of subsection 517.061(11)(a) makes the purchase voidable "either within 3 days after the tender of consideration [was] made by the purchaser to the issuer, an agent of the issuer, or an escrow agent or within 3 days after the availability of that privilege is communicated to such purchaser, whichever occurs later." § 517.061(11)(a)5 (emphasis added). The statute contains no provision for the tolling of the right to rescind the sale in the event availability of the right to rescind is never communicated to the purchaser.[4]
The trial court found that the appellees "had actual knowledge of their right to rescind their stock purchase more than one year in advance of their rescissions...." The trial court further concluded, though, that the "actual knowledge" possessed by the appellees was "not enough to trigger the three day period under § 517.061(11)(a)5, Fla. Stat." Under the facts in the record before us, we are not persuaded that the trial court erred in reaching this latter ruling.
Moecker asserts that, since appellees admit that they had knowledge of a general rescission right, some communication of the rescission right must have been made to them. Therefore, Moecker argues, the statutory communication requirement must have been satisfied and the three-day rescission period has long expired. We do not agree.
The statutory obligations of the offering party in an unregistered sale are to be strictly construed. Barnebey v. E.F. Hutton & Co., 715 F.Supp. 1512, 1532 (M.D.Fla.1989). The purpose of laws requiring the registration of securities is to protect the public from fraudulent and deceptive practices in the sale and marketing of securities. See Stottler Stagg and Associates, Inc. v. Argo, 403 So.2d 617, 618 (Fla. 5th DCA 1981). By engaging in a sale of securities exempt from state registration requirements, an issuer is able to avoid significant expense and regulatory oversight. Thus, the issuer must strictly comply with the requirements for engaging in an exempt transaction to protect innocent purchasers of securities. Henderson v. Hayden, Stone Inc., 461 F.2d 1069, 1072 (5th Cir.1972).
As did the trial court, we find the reasoning of the court in Barnebey v. E.F. Hutton & Co. persuasive. As the court there explained, the intent of section 517.061(11)(a)5, in part, is to provide purchasers with a fixed event from which to calculate the time available for voiding a purchase under the statute. Id. at 1532. The statute sets that fixed event as being either one of two possible happenings, both of which a "purchaser would or should be aware, and from which a purchaser could easily calculate the running of the clock on his privilege [to rescind the purchase]." *909 Id. at 1531. The written notice in Barnebey provided that the right to rescind the purchase commenced at the submission of the subscription agreement to the general partner of the offering company, an event which a purchaser could not be aware until well after the fact. Thus, the Barnebey court ruled that the issuer did not satisfy its burden of demonstrating compliance with the conditions necessary for claiming an exemption from registration of securities. Id.
Here, the trial court found, and Moecker does not dispute, that First Street failed to communicate to appellees their right to rescind the purchase of stock under section 517.061(11)(a)5. While we agree with Moecker that the literal text of the statute does not require the issuer to communicate the rescission right to purchasers, the issuer nonetheless has the burden of establishing that such a communication is made. See Weinberg; Barnebey. Thus, in private placements to Florida residents issuers commonly include a disclosure in the subscription or offering documents notifying purchasers of their rescission rights under Florida law.[5]
Moecker argues that, since the trial court found that the appellees had actual knowledge of a rescission right over a year prior to their rescissions, they should not be allowed to sit on their rights indefinitely. We agree that "a person has no right to shut his eyes or ears to avoid information and then say he had no notice." Symons v. State Dep't of Banking and Fin., 490 So.2d 1322, 1324 (Fla. 1st DCA 1986). Nevertheless, "[i]n order to charge a person with notice of information which might have been learned by inquiry, the circumstances must be such as should reasonably suggest inquiry. A determination of whether there are sufficient facts known to require further investigation generally is one of fact." Id. (citing Rafkind v. Beer, 426 So.2d 1097, 1099 (Fla. 3d DCA 1983)). The task of determining whether the circumstances should give rise to such notice is left to the trier of fact. Symons, 490 So.2d at 1324. On review, our role is to determine whether there is competent substantial evidence to support the trial court's finding. State v. Glatzmayer, 789 So.2d 297, 301 n. 7 ("If the ruling consists of a pure question of fact, the ruling must be sustained if supported by competent substantial evidence.").
Moecker has not claimed or shown that First Street, its agent or any third party communicated to any appellee the right to rescind under chapter 517. The record contains no evidence of the specific event that made the appellees aware of their right to rescind, when they learned of the right, the extent or detail of their knowledge, or the period in which they must exercise the right to rescind.[6]Compare *910 Barnebey, 715 F.Supp. at 1532. Further, although it is undisputed that First Street employed Mr. Antoine as chief accounting officer and Mr. Matthews as an attorney, there is no evidence in the record that either of them possessed specialized professional expertise or knowledge with respect to the rescission provisions of chapter 517.
While we agree with Moecker that a person with actual and complete knowledge of the rescission rights under section 517.061(11)(a)5 in a particular offering, including when the rescission period commences, should not be able to sit on his or her knowledge and play "gotcha" with the rescission right, those facts do not exist in this record. That the appellees somehow learned of a general rescission right sometime after the insolvency of First Street does not, without more, obviate First Street's failure to show that the availability of the rescission right was communicated to appellees. Needless to say, the decision of a trial court comes to the appellate court clothed in a presumption of correctness. Applegate v. Barnett Bank of Tallahassee, 377 So.2d 1150, 1152 (Fla.1979). It is the burden of the appealing party to demonstrate a basis in the record for overturning the presumptively correct decision of the trial court. See Klette v. Klette, 785 So.2d 562 (Fla. 1st DCA 2001). Because there is no record basis for determining how and when the rescission right was communicated to appellees, or the nature of information communicated, we affirm the trial court's ruling that the appellees possessed the right to rescind.

Assignment for the Benefit of Creditors
In an assignment for the benefit of creditors, the debtor voluntarily assigns its assets to a third party as trustee for the purpose of liquidating the assets to satisfy, in full or in part, creditors' claims against the debtor. See Brainard v. Fitzgerald, 3 Cal.2d 157, 44 P.2d 336, 339 (Cal.1935); see generally Lynn M. Lopucki, The Death of Liability, 106 Yale L.J. 1, 18 n. 70 (1996). An assignment for the benefit of creditors is an alternative to bankruptcy,[7] but unlike federal bankruptcy proceedings, which operate upon a uniform procedure in all jurisdictions, the procedure for assignments for the benefit of creditors varies from jurisdiction to jurisdiction. Further, assignment is seen as a cooperative effort which can benefit creditors by affording prompt and relative inexpensive resolution of claims. See generally 19 Fletcher Cyclopedia of Private Corp. § 6:13 (2002). The practice of assignment for the benefit of creditors existed at common law, see, e.g., Donegan v. Baker & Holmes, Co., 73 Fla. 241, 74 So. 202 (1917), but has been codified since Roman times. See David S. Kennedy & R. Spencer Cleft III, An Historical Analysis of Insolvency Laws and Their Impact on the Role, Power and Jurisdiction of Today's United States Bankruptcy Court and its Judicial Officers, 9 J. Bankr.L. & Prac. 165, 167 (2000). Florida codified the law governing assignments for benefit of creditors by the enactment of chapter 727 in 1987. See Ch. 87-174, Laws of Florida.
Chapter 727 is intended "to provide a uniform procedure for the administration of insolvent estates," section 727.101, Florida Statutes (1997), subject to the supervision of the circuit court. Section 727.104 provides a form of assignment, and requires the assignee to record the assignment in the public records as well as to file *911 a petition and bond in the circuit court. Section 727.114 sets the priority for the claims against the insolvent estate. In the event there are insufficient assets to satisfy all proper claims made against the estate, claims are to be paid on a pro rata basis and in proportion to the scheme of priority provided in section 727.114. See § 727.104(1)(b).
Section 727.112(1) provides that all claims, which arose prior to the filing date, other than those claims made by creditors with liens upon assets in the insolvent estate, must be filed in accordance with chapter 727. A claim must be filed within 120 days of the filing date of the petition for assignment. §§ 727.112(2), (5). Claims not filed in accordance with chapter 727 are barred. § 727.112(1). The term "claim" is not defined in chapter 727, nor has the term been defined by case law in the context of chapter 727. A "creditor" is defined in section 727.103(6) as "any person having a claim against the assignor, whether such claim is contingent, liquidated, unliquidated, or disputed."[8] There is been little decisional law construing Chapter 727.
Moecker asserts that the trial court erred in allowing the appellees' claims for rescission, arguing that the claims arose after the filing date of the petition and were, thus, barred by section 727.112(1).[9] We cannot agree. Section 727.112(1) limits claims to those which "arose" prior to the filing of the petition. Although the term "arose" is not defined in chapter 727, we find case law defining the same term under the Bankruptcy Code instructive.[10] Although "federal law controls which claims are cognizable under the Code, the threshold question of when a right to payment ... arises `is to be determined by reference to state law.'" In Re M. Frenville Co., 744 F.2d 332, 337 (3d Cir.1984), cert. denied, 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985)(quoting Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 161, 67 S.Ct. 237, 239, 91 L.Ed. 162 (1946)). Further,
[p]rocedural and extraneous factors such as the timing of the filing of a summons and complaint by a third party, which is not associated with the underlying nature of the cause of action ... simply should not determine the existence or nonexistence of a "claim." Rather the focus should be on the time when the *912 acts giving rise to the alleged liability were performed....
In re Johns-Manville Corp., 57 B.R. 680, 690 (Bankr.S.D.N.Y.1986).
As discussed above, the appellees rescinded their purchases of First Street stock based upon the rescission rights provided by section 517.061(11)(a)(5).[11] That statute makes an applicable unregistered purchase voidable within three days after the tender of consideration by the purchaser or within three days after the availability of the rescission privilege is communicated to the purchaser. § 517.061(11)(a)(5). Thus, if the appellees possessed the right to rescind their purchases of First Street common stock, that right arose as a result of the unregistered sale of securities by First Street and existed at the date of their purchase of First Street stock in 1998. Because the transaction and conduct giving rise to the appellees' rescission right occurred prior to the petition date, we conclude that the appellees' claims "arose" prior to that date.
Moecker also urges this court to interpret chapter 727 in a manner that would treat claims arising from the rescission of a purchase of common stock of the debtor with the same priority as holders of that common stock. The sole authority cited by Moecker for this argument is section 510(b) of the Bankruptcy Code and the case law interpreting that section.
Section 510(b) of the Bankruptcy Code provides, in pertinent part, that:
For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor ... shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.
11 U.S.C. § 510(b). The policy underlying section 510(b) recognizes the difference in the risk expectations between creditors and shareholders.
[B]oth investors and credits accept the risk of enterprise insolvency but to a different degree.... This stems from their dissimilar expectations. Even if the business prospers, the creditor anticipates no more than the repayment of his fixed debt. Further, the shareholder's investment provides an equity cushion for the repayment of the claim.... The investors, on the other hand, share the profits to the exclusion of the creditors. The shareholder's enhanced risk of insolvency represents the flipside of his unique right to participate in the profits. The allocation of the risk, as between the investor and the creditor, is reflected by the absolute priority rule....
In re Granite Partners, L.P., 208 B.R. 332, 336 (Bankr.S.D.N.Y.1997) (citations omitted); see also In re Int'l Wireless Comm. Holdings, Inc., 257 B.R. 739, 746 (Bankr. D.Del.2001). Thus, under section 510(b), equity investors such as the appellees are prevented from converting their equity interests into higher priority general unsecured claims by asserting fraud or rescission claims. See, e.g., Christian Life Ctr. Litig. Defense Comm. v. Silva (In re Christian Life Ctr.), 821 F.2d 1370, 1375 (9th Cir.1987); The Ltd. Partners' Comm. v. Official Trade Creditors' Comm. (In re Amarex, Inc.), 78 B.R. 605 (W.D.Okla. 1987).
The Florida legislature, however, has not included in chapter 727 any provision expressing an intent to subordinate rescission *913 claims in a manner similar to the subordination scheme adopted by Congress in section 510(b). Further, prior to the 1978 adoption of section 510(b), courts generally allowed defrauded shareholders to rescind their subscription and treated the rescission claim as a general unsecured claim. See Oppenheimer v. Harriman Nat'l Bank & Trust Co., 301 U.S. 206, 57 S.Ct. 719, 81 L.Ed. 1042 (1937); see also MacNamee v. Bankers' Union for Foreign Commerce & Fin., 25 F.2d 614 (2d Cir. 1928); Jagels v. Cox, 50 Idaho 67, 294 P. 515 (1930); Burningham v. Burke, 67 Utah 90, 245 P. 977 (1926); Atwood v. McKenzie-Waterhouse Co., 120 Wash. 214, 206 P. 978 (1922); see generally Annotation, 41 A.L.R. 674 (1926); Annotation, 46 A.L.R. 484 (1927); Kenneth B. Davis, Jr., The Status of Defrauded Security Holders in Corporate Bankruptcy, 1983 Duke L.J. 1. Thus, even though the public policy underlying section 510(b) seems sound, we decline the invitation to interpret the unambiguous provisions of chapter 727 as if it included a provision subordinating the appellees' rescission claims to those of all creditors. See A.R. Douglass, Inc. v. McRainey, 102 Fla. 1141, 1144, 137 So. 157, 159 (1931)("The intention and meaning of the Legislature must primarily be determined from the language of the statute itself and not from conjectures aliunde. When the language of the statute is clear and unambiguous and conveys a clear and definite meaning, ... for the statute must be given its plain and obvious meaning."); Am. Bankers Life Assurance Co. of Fla. v. Williams, 212 So.2d 777, 778 (Fla. 1st DCA 1968)(explaining that courts are "without power to construe an unambiguous statute in a way which would extend, modify, or limit its express terms or its reasonable and obvious implications" because to do so "would be an abrogation of legislative power.").
Accordingly, for the reasons discussed above, we affirm.
PADOVANO, J., CONCURS AND WEBSTER, J., DISSENTS WITH WRITTEN OPINION.
WEBSTER, J., dissenting.
I find myself constrained to dissent because I am unable to reconcile the majority's decision with the clear language of section 517.061(11)(a)5, Florida Statutes (1997).
As the majority points out in the last substantive paragraph of its opinion, we are obliged to glean meaning from legislation principally by reference to the language used. When that language is clear and unambiguous, there is nothing for us to construe. In such a case, our job consists of nothing more than applying the plain meaning of the statute to the facts presented. I am of the view that section 517.061(11)(a)5 is such a piece of legislation.
Reduced to its essentials, section 517.061(11)(a)5 says that "any sale ... is voidable by the purchaser ... either within 3 days after the first tender of consideration... or within 3 days after the availability of that privilege is communicated to such purchaser, whichever occurs later." "Communicate" is a word with which we are all familiar. There is nothing in the statute to suggest an intent on the part of the legislature that the word have other than its most common meaning. The Random House Dictionary of the English Language (2d ed. unabridged 1987) lists the most common meaning of "communicate" as "to impart knowledge of; make known." Id. at 414. Accordingly, in this case the key question is when availability of the privilege to void the stock transactions was made known to appellees. For our purposes, the trial court has answered that question. It found that appellees "had actual knowledge of their right to rescind their stock purchase more than one year in advance of the rescissions," *914 and appellees have not challenged this finding by cross-appeal. Because I can find nothing in the statute that places any importance on how such knowledge was acquired, I would end our inquiry at this point, and hold that the attempt to rescind was untimely. While it may well be true (as the majority notes) that such a common-sense reading of the words used by the legislature carries with it the possibility of difficult application in some fact situations, that is a problem to be dealt with by the legislature, not us.
On the record before us, it is undisputed that Messrs. Antoine and Matthews were employed by First Street Mortgage Corporation, the former as vice-president and chief accounting officer and the latter as a lawyer. The trial court found that all of the appellees had "actual knowledge" of their right to rescind for more than a year before they attempted to exercise that right. Given these facts, it strikes me as utterly irrelevant whether someone speaking for First Street actually informed them of that right.
The trial court's error was one of law. It incorrectly construed the statute as requiring that the issuer communicate to the purchaser the fact that the purchaser might void the transaction. As a matter of law, the attempted rescission was untimely. Accordingly, I would reverse and remand with directions that the trial court sustain the objections to appellees' claims. Because the majority affirms, respectfully, I dissent.
NOTES
[1] The appellant, Michael Moecker, an individual, has been substituted as assignee for Michael Moecker and Associates, Inc.
[2] The term "blue sky" is attributed to a variety of origins. See, e.g., Hall v. Geiger-Jones Co., 242 U.S. 539, 550, 37 S.Ct. 217, 61 L.Ed. 480 (1917) ("speculative schemes which have no more basis than so many feet of `blue sky'"); L. Loss & E. Cowett, Blue Sky Law, 7 n. 22 (1958)("the term `blue sky' was first used to describe the business practices of promoters and securities salesmen in Kansas at the turn of the century. The activities of these individuals, it was claimed, bordered on the sale of building lots in the blue sky in fee simple.").
[3] Section 517.061 provides that the registration requirements of section 517.07 do not apply to, among other transactions, to:

(11)(a) The offer or sale, by or on behalf of an issuer, of its own securities, which offer or sale is part of an offering made in accordance with all of the following conditions:
1. There are no more than 35 purchasers, or the issuer reasonably believes that there are no more than 35 purchasers, of the securities of the issuer in this state during an offering made in reliance upon this subsection or, if such offering continues for a period in excess of 12-months, in any consecutive 12 month period.
2. Neither the issuer nor any person acting on behalf of the issuer offers or sells securities pursuant to this subsection by means of any form of general solicitation or general advertising in this state.
3. Prior to the sale, each purchaser or the purchaser's representative, if any, is provided with, or given reasonable access to, full and fair disclosure of all material information.
4. No person defined as a "dealer" in this chapter is paid a commission or compensation for the sale of the issuer's securities unless such person is registered as a dealer under this chapter.
5. When sales are made to five or more persons in this state, any sale in this state made pursuant to this subsection is voidable by the purchaser in such sale either within 3 days after the first tender of consideration is made by such purchaser to the issuer, an agent of the issuer, or an escrow agent or within 3 days after the availability of that privilege is communicated to such purchaser, whichever occurs later.
[4] By contrast, the federal Truth-in-Lending Act avoids the problem presented in the instant case by limiting to three years the period within which the right to rescind a purchase may be exercised in the event the right to rescind is not communicated. See 15 U.S.C. § 1635(f); see generally Elwin Griffith, Truth in LendingThe Right of Rescission, Disclosure of the Finance Charge, and Itemization of the Amount Financed in Closed In Transactions, 6 Geo. Mason L.Rev. 191 (1998).
[5] See, e.g., Jeff Mihm, Private Placements in Florida After the National Securities Markets Improvement Act of 1996, 73 Fla. B.J. 44, 48 n. 20 (Feb.1999); and Peter M. Fass & Derek A. Wittner, Blue Sky Prac.App. 9F¶ 1352 (2002).
[6] The record on appeal is very limited as to facts relating to the appellees' knowledge of their rescission rights. The only record evidence of the appellees' knowledge is a bare admission of knowledge of section 517.061(11)(a)5 contained in the appellees' rescission notice filed below. The record before us does not include a transcript of the hearing held on the assignee's objections and the appellees' rescission, at which testimony was apparently taken on this issue. At the February 2, 2002, hearing on the parties' rehearing motions directed to the order on appeal, appellees objected to the trial court's finding that they had actual knowledge of the right to rescind. They asserted that, while they had knowledge of the rescission statute, they had no "actual knowledge of a fully vested and ripened right to rescind." Nevertheless, the trial court's finding that appellees had actual knowledge of their rescission right has not been challenged on appeal.
[7] Although the Bankruptcy Code preempts state laws governing insolvent debtors, Int'l Shoe Co. v. Pinkus, 278 U.S. 261, 265-66, 49 S.Ct. 108, 73 L.Ed. 318 (1929), state laws governing voluntary assignments for the benefit of creditors are permitted if such laws do not provide for a discharge of debts. Id. at 268, 49 S.Ct. 108.
[8] By comparison, under the Bankruptcy Code, a creditor is an entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor. 11 U.S.C. § 101(10)(A) (1993). Under section 101(5) of the Bankruptcy Code, a claim is defined as

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.
11 U.S.C. § 101(5) (1993).
[9] The parties do not dispute, and we do not address, whether, if the rescission claim is held to arise prior to the filing date, the appellees may amend their claims more than 120 days after the filing date by converting a claim filed as a shareholder to a claim of a general unsecured creditor.
[10] State courts often look to federal bankruptcy law for guidance as to legal issues arising in proceeding involving assignments for the benefit of creditors. See Blonder v. Cumberland Eng'g, 71 Cal.App.4th 1057, 84 Cal. Rptr.2d 216 (1999); Angeles Elec. Co. v. Superior Court, 27 Cal.App.4th 426, 32 Cal.Rptr.2d 660 (1994); In the Matter of the General Assignment for Benefit of Creditors of M.S. Ackerman, Inc., 19 Misc.2d 260, 186 N.Y.S.2d 406 (N.Y.Sup.Ct.1959); Pavone Textile Corp. v. Bloom, 302 N.Y. 206, 97 N.E.2d 755 (1951).
[11] The appellees have argued that officers of First Street misrepresented the financial condition of the corporation to induce appellees to purchase stock. Nevertheless, appellees have not filed any claims based on fraud.