RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0284p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

In re:  GEORGE A. BAVELIS,

                                                _Debtor._

_____

GEORGE A. BAVELIS,

                              _Plaintiff-Appellee_,

     _v._

TED DOUKAS,

                              _Defendant-Appellant._

No. 14-3067

_____

Appeal from the United States Bankruptcy Court
for the Southern District of Ohio and the
Bankruptcy Appellate Panel of the Sixth Circuit.
No. 10-58583—John E. Hoffman, Bankruptcy Judge;
No. 13-8015—George W. Emerson, Jr., Arthur I. Harris, and
Marci B. McIvor, Bankruptcy Appellate Panel Judges.

Argued:  October 7, 2014

Decided and Filed:  November 26, 2014

Before:  BATCHELDER, GILMAN, and GIBBONS, Circuit Judges.

_____

### COUNSEL

**ARGUED:**  Mark E. Brown, MENEFEE & BROWN, Knoxville, Tennessee, for Appellant. Christopher J. Hogan, ZEIGER, TIGGES & LITTLE, LLP, Columbus, Ohio, for Appellee.  **ON BRIEF:**  Mark E. Brown, MENEFEE & BROWN, Knoxville, Tennessee, for Appellant. Christopher J. Hogan, Marion H. Little, Jr., ZEIGER, TIGGES & LITTLE, LLP, Columbus, Ohio, for Appellee.

1

———————————

**OPINION**

———————————

RONALD LEE GILMAN, Circuit Judge.  George A. Bavelis sought relief under Chapter 11 of the Bankruptcy Code in 2010 due to sizable debts that he had accumulated from his numerous business ventures.  Bavelis subsequently brought an adversary proceeding against several defendants.  These defendants included his friend and business associate Ted Doukas, as well as a number of businesses owned and controlled by Doukas (the Doukas Defendants).  One of Doukas's companies responded by filing a proof of claim against the Bavelis bankruptcy estate.

In the bankruptcy proceedings that followed, the Doukas Defendants argued, among other things, that Doukas had a claim for rescissionary relief against Bavelis based on the latter's purported violations of Florida's securities laws related to stock that Doukas had purchased from a Bavelis-run bank holding company.  The bankruptcy court concluded, however, that Doukas does not have a viable claim against Bavelis under Florida law.

The Bankruptcy Appellate Panel (BAP) affirmed.  Doukas now argues that the bankruptcy court acted beyond its constitutional authority in interpreting Florida law and, further, that the interpretation by both the bankruptcy court and the BAP was in error.  For the reasons set forth below, we **AFFIRM** the judgment of the BAP.

## I. BACKGROUND

### A.  Factual background

The facts relating to the issues on appeal are essentially undisputed and were exhaustively compiled by the bankruptcy court, *Bavelis v. Doukas (In re Bavelis)*, 490 B.R. 258 (Bankr. S.D. Ohio 2013), and summarized by the BAP, *Quick Capital of L.I. Corp. v. Bavelis (In re Bavelis)*, No. 13-8015, 2013 WL 6672988 (B.A.P. 6th Cir. Dec. 19, 2013) (unpublished).  The only relevant findings of fact challenged by Doukas are related to the bankruptcy court's decision to credit Bavelis's testimony over that of Doukas.  Because of the great deference required where a trial court's factual findings rest on the decision to credit the testimony of one

witness over another, *see Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985) (explaining that a factfinder's decision to credit the testimony of one of two or more witnesses can "virtually never be clear error"), we have adopted the bankruptcy court's relevant findings in their entirety.

### 1. Bavelis's career

Bavelis immigrated to the United States from his native Greece in 1958. Starting in the early 1970s, Bavelis became involved in real estate, first by subleasing rental properties and later by purchasing and leasing out apartment buildings. He was engaged full time in the real estate business by 1975. In subsequent years he formed more than 30 real estate investment partnerships operating in central Ohio. Bavelis personally guaranteed the mortgage debts incurred by these partnerships.

In 1996, Bavelis and other investors acquired Sterling Bank, a federally chartered savings bank located in Lantana, Florida. Eight years later the bank was converted into a commercial bank chartered by the state of Florida. Bavelis was a director of Sterling Bank, as well as the chairman of the board, chief executive officer, and president of its parent company, Sterling Holding (also known as Sterling BancGroup, Inc.). At one point, Bavelis and members of his family, both directly and through trusts, owned between 52-55% of Sterling Holding.

Bavelis met Leftheris "Ted" Doukas through the bank. The two men first crossed paths when Doukas obtained title to several residential properties encumbered by security interests held by Sterling Bank. Initial negotiations between Doukas and Sterling Bank employees regarding the outstanding debt on the properties went poorly, causing the parties to seek Bavelis's assistance. These initial business dealings triggered a social relationship between the two men, and Doukas became close friends with both Bavelis and Bavelis's wife.

### 2. Bavelis's financial struggles

By the spring of 2009, Bavelis was under considerable financial pressure. He was struggling to service more than $18 million in bank debt from numerous business ventures and, as with his Ohio-based partnerships, Bavelis had personally guaranteed (or otherwise had

personal liability on) all of this debt. In addition, both Sterling Holding and Sterling Bank desperately needed cash infusions totaling over $12 million.

With his friend in dire financial straits, Doukas offered his assistance on numerous fronts. Among other actions, Doukas negotiated with one of Bavelis's business partners, Mahammad Qureshi, to reapportion the partners' respective bank-debt responsibilities; he purchased $200,000 worth of Sterling Holding stock in March 2009 and deposited $2 million into his accounts at Sterling Bank to help keep the bank afloat; and, despite the fact that he was neither a lawyer nor an estate planner by trade, Doukas offered to help Bavelis with estate planning.

### 3. The contested transactions

In addition to the above matters, Bavelis, Doukas, and their associated business entities were involved in two large transactions at the heart of this appeal. Both matters are set forth below.

#### i. Promissory note and loan agremeent

First, in June 2009, at Doukas's suggestion, Bavelis signed and delivered to Doukas a $14 million promissory note payable to Quick Capital, one of Doukas's companies. The note identifies the consideration as "FOR VALUE RECEIVED." It specifies an interest rate of 5% per annum and calls for the balance due on June 21, 2014. Bavelis also signed a security agreement, granting Quick Capital an interest in certain shares of Sterling Holding.

In addition to the promissory note and the security agreement, Bavelis and Doukas signed a loan agreement. The loan agreement does not refer to the promissory note, but contains the following two recitals:

> Whereas Quick has provided and will continue to provide consulting and management services in an effort to restructure various liabilities and troubled assets owned directly or indirectly by [Bavelis]; and

> Whereas [Bavelis] as security for the payment of these services rendered and to be rendered agrees to provide a security interest for Quick in various securities in the amount of Fourteen Million ($14,000,000) Dollars[.]

The loan agreement further states that Quick Capital "shall tender the sum of Two hundred Thousand ($200,000) Dollars to George A. Bavelis." Doukas gave Bavelis a check for

$250,000 shortly thereafter (the extra $50,000 was related to another transaction between the two of them). Within one month, Bavelis had repaid the full sum to Doukas.

Although the parties had no expectation of following through on the remaining terms of these documents, Bavelis signed them because Doukas had convinced him that they were part of a complicated estate-planning scheme that Doukas would arrange on Bavelis's behalf. Specifically, Doukas was "going to form a Nevada corporation because there were some advantages that Nevada corporations have." Although the bankruptcy court acknowledged that this explanation seems "implausible," it accepted Bavelis's version of events based in large part on the fact that Bavelis "considered [Doukas] a friend and brother in whom he could place the utmost confidence and trust," *Bavelis*, 490 B.R. at 276.

Prior to signing, Bavelis obtained an oral promise from Doukas that Bavelis would not have to make any payments on the note. As Bavelis testified: "[W]hen I gave him this note for $14,000,000 I said, 'Ted, you don't expect me to make payments for this thing?' He said, 'No, no, no, you don't need to make payments.'" Doukas told Bavelis that the note would be returned once the estate planning was finalized, but Doukas never completed Bavelis's estate plan.

### ii. Sterling Holding stock purchase

Second, and of at least equal importance, Doukas agreed to purchase nearly $1.5 million of stock in Sterling Holding in September 2009 (in addition to the $200,000 of stock he bought in March 2009). Doukas's purchase came in response to an August 7, 2009 letter from Bavelis to all Sterling Holding shareholders (including Doukas). The letter stated in relevant part as follows:

> Sterling Bank, like a high majority of the banks in Florida, has been coping with the troubled loans so far and a written agreement has been reached between the Bank, the Federal Reserve and the State of Florida that we must reserve additional funds for reserves and further increase our capital ratios even though we have always been in the "well capitalized" category. In an effort to comply with the regulators [sic] requests and increase our regulatory ratios to the unprecedented higher ratios, the Board of Directors unanimously approved raising $12,600,000 new capital, primarily from the existing shareholder[s] through the end of the month, on a prorata basis at $100 per share for Class A and $80 per share of Class B and any shareholder may purchase any additional Common Shares of Class A or Class B for the same pro rata after August 31, 2009. Class A Shares are voting

and Class B shares are non-voting but the shareholder distributions of both classes of shares will be the same as soon as our bank begins distributing money again with the permission of our regulators which we hope to be sometime in a year or two.

The letter was accompanied by a subscription agreement, a confidential private placement memorandum (PPM), and an annual report. Like all shareholders of Sterling Holding, Doukas was sent a copy of these materials. In addition, Bavelis personally gave Doukas a copy of the PPM, and the two later discussed its contents. The PPM provided a "Notice to Florida Residents" stating that the securities had not been registered and that all persons purchasing the securities in Florida had a three-day right of rescission under Fla. Stat. § 517.061(11)(a)(5). Specifically, the PPM stated as follows:

> THE SECURITIES HAVE NOT BEEN REGISTERED WITH THE FLORIDA DIVISION OF SECURITIES. ALL PERSONS PURCHASING SHARES IN FLORIDA HEREUNDER HAVE THE RIGHT, PURSUANT TO SECTION 517.061(11)(a)(5) OF THE FLORIDA SECURITIES ACT, TO WITHDRAW HIS SUBSCRIPTION FOR THE PURCHASE, AND RECEIVE A FULL REFUND OF ALL MONIES PAID, WITHIN THREE (3) DAYS AFTER THE EXECUTION OF THE SUBSCRIPTION AGREEMENT OR PAYMENT FOR THE PURCHASE HAS BEEN MADE, WHICHEVER IS LATER. WITHDRAWAL WILL BE WITHOUT ANY FURTHER LIABILITY TO SUCH PERSON. TO ACCOMPLISH THIS WITHDRAWAL, A SUBSCRIBER NEED ONLY SEND A CERTIFIED LETTER RETURN RECEIPT REQUESTED TO THE COMPANY AT THE ADDRESS SET FORTH IN THIS CONFIDENTIAL MEMORANDUM, INDICATING HIS INTENTION TO WITHDRAW.

Although Doukas did not sign a subscription agreement, he informed an employee at Sterling Bank during a telephone call on the morning of September 23, 2009 that he wished to purchase stock in Sterling Holding, referencing the price for the Class B shares. Around noon that day, the Sterling Bank employee, R. Moyle Fritz, sent Doukas an email confirming the substance of their conversation. Doukas responded and authorized the transfer.

When Doukas purchased the shares in September 2009, he requested that the issuance of a stock certificate be deferred until after he formed a trust similar to one that had been set up by Bavelis, at which time the certificate would be placed in the name of Doukas's trust. The stock certificate was not issued until February 2010.

On February 4, 2010, Bavelis sent Doukas a transmittal letter dated September 23, 2009, enclosing a stock certificate also dated September 23, for 18,309 shares of Class B stock in Sterling Holding. Doukas received the certificate on February 8, 2010. One week later, on February 15, 2010, Doukas sent a letter to Bavelis that sought to reject the certificate. In the letter, Doukas wrote that he "never requested any stock." Rather, Doukas claimed that he had sent the money as "part of the consideration for a Promissory Note dated June 21, 2009." This assertion is inconsistent with several established facts in this case, including the email exchange between Doukas and Fritz on September 23, 2009.

## B. Procedural background

### 1. Bankruptcy court proceedings

Shortly thereafter, Bavelis reached the point where he could no longer service his debts. He filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in July 2010. Bavelis then commenced this proceeding by filing a 15-count complaint against several defendants, including Doukas and Quick Capital. In Count Three of the complaint, Bavelis sought, among other things, a declaratory judgment that the Quick Capital note (1) fails for lack of consideration, (2) is void, (3) should be rescinded based on fraudulent inducement, and (4) has been fully satisfied.

Following the commencement of the adversary proceeding, Quick Capital filed a proof of claim in the amount of approximately $1.7 million for "Money Loaned" (equal to Doukas's Sterling Holding stock purchases in March and September 2009) and later filed an amended proof of claim in the amount of $14 million plus interest (for the promissory note). No other Doukas entity filed a proof of claim against the Bavelis bankruptcy estate.

Quick Capital's proof of claim and amended proof of claim were both properly filed, thus establishing a prima facie case regarding the validity and amount of the claims. *See* 11 U.S.C. § 502(a); Fed. R. Bankr. P. 3001(f). At this point, the burden shifted back to Bavelis to refute Quick Capital's allegations. *See Lombardo v. Airelect, Inc.*, No. 97-1586, 1998 WL 964250, at *2 (6th Cir. Dec. 29, 1998) (unpublished) (citing *Wright v. Holm (In re Holm)*, 931 F.2d 620, 623 (9th Cir. 1991)). The bankruptcy court construed the forms of relief requested in Count

Three as objections to the proof of claim pursuant to § 502(b) of the Bankruptcy Code and Rule 3007(a) of the Federal Rules of Bankruptcy Procedure. *See Bavelis v. Doukas (In re Bavelis)*, 453 B.R. 832, 852 (Bankr. S.D. Ohio 2011).

Bavelis subsequently filed a motion to bifurcate the Quick Capital proceeding for a hearing, which the bankruptcy court granted, separating out Count Three of the complaint. Following the bankruptcy court's bifurcation order, Quick Capital filed a motion for summary judgment. The court denied the motion with respect to the proof-of-claim objections based on the presence of genuine disputes as to material facts, but deferred any resolution regarding the remainder of the motion.

In April 2012, the bankruptcy court conducted a four-day evidentiary hearing. That hearing focused on the objections to the proof of claim and the amended proof of claim. In their proposed findings of fact, the Doukas Defendants asked the court to find that Doukas never intended to purchase any stock in Sterling Holding; rather, they argued, Doukas transferred $1.7 million as part of the June 2009 agreement entered into between Quick Capital and Bavelis. Quick Capital alternatively argued that, if the court concluded that Doukas had purchased the shares, then he has a claim against Bavelis under Florida state law regulating the sale of securities. Under this theory, Bavelis would be personally liable for his participation in the allegedly unlawful stock sale pursuant to Fla. Stat. § 517.211(1).

The bankruptcy court issued its opinion in March 2013, disallowing Quick Capital's claim and amended claim. In its exhaustive 131-page opinion, the court found that Quick Capital's claim predicated on the $14 million promissory note failed, among other reasons, for lack of consideration and because of fraudulent inducement. Furthermore, the court held that Doukas has no viable claim against Bavelis under Florida's securities laws because "[t]here is no evidence that the sale of securities was . . . unlawful." *Bavelis*, 490 B.R. at 327. The bankruptcy court also found "Bavelis to be a much more credible witness than . . . Doukas." *Id.* at 304.

### 2. BAP proceedings

The Doukas Defendants subsequently filed a timely appeal to the BAP. That appeal raised the issues of whether the bankruptcy court erred in (1) disallowing the claims filed by

Quick Capital, and (2) concluding that Doukas and his related entities have no claims against Bavelis for violations of Florida's securities laws.

In December 2013, the BAP affirmed the bankruptcy court's decision in its entirety. The BAP specifically held that there was "ample evidence" in the record to support the bankruptcy court's findings that (1) "Bavelis was fraudulently induced to sign the promissory note and security agreement," (2) "Bavelis's performance under the note was excused by failure of consideration," and (3) "Bavelis paid in full any and all amounts he owed Appellants pursuant to the [Quick Capital] Loan Documents." *Quick Capital*, 2013 WL 6672988, at *13-17. Furthermore, the BAP concluded that the bankruptcy court did not err in determining that Doukas and his related entities have no prospective claims against Bavelis for any violation of Florida's securities laws. Doukas subsequently filed this timely appeal in January 2014.

## II.     DISCUSSION

### A.  Standard of review

This court independently reviews a decision of the bankruptcy court that has been appealed to the BAP. *Tidewater Fin. Co. v. Curry (In re Curry)*, 509 F.3d 735, 735 (6th Cir. 2007). We review de novo the bankruptcy court's conclusions of law. *Behlke v. Eisen (In re Behlke)*, 358 F.3d 429, 433 (6th Cir. 2004). In this context, the application or interpretation of state law is a conclusion of law reviewed de novo. *In re Wengerd*, 453 B.R. 243, 245 (B.A.P. 6th Cir. 2011).

The bankruptcy court's findings of fact, in contrast, are reviewed under the clear-error standard. *In re Behlke*, 358 F.3d at 433. A finding of fact is deemed clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Riverview Trenton R.R. Co. v. DSC, Ltd. (In re DSC, Ltd.)*, 486 F.3d 940, 944 (6th Cir. 2007) (internal citations omitted).

"Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1166 (6th Cir. 1996) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985)). Moreover, to the extent that a factfinder's conclusions rest on credibility determinations, this

court has held that Rule 52 of the Federal Rules of Civil Procedure "requires even greater deference." *Bartling v. Fruehauf Corp.*, 29 F.3d 1062, 1067 (6th Cir. 1994) (citing *Anderson*, 470 U.S. at 575).

## B. Bankruptcy court's authority to adjudicate state-law claims

Doukas argues that the bankruptcy court "lacked constitutional authority to enter judgment on his right of rescission of the Sterling Bank stock sale to him" under Article III of the United States Constitution. Specifically, Doukas contends that his claim here is a "noncore" matter and, therefore, the bankruptcy court lacked the authority to enter a final judgment.

The distinction between core and noncore matters is fundamental to a bankruptcy court's jurisdiction. This court has defined a core proceeding as one that "either invokes a substantive right created by federal bankruptcy law or one which could not exist outside of the bankruptcy." *Lowenbraun v. Canary (In re Lowenbraun)*, 453 F.3d 314, 320 (6th Cir. 2006) (internal quotation marks omitted); *see also Waldman v. Stone*, 698 F.3d 910, 917-22 (6th Cir. 2012) (distinguishing between a bankruptcy court's authority in core versus noncore proceedings). A nonexhaustive list of examples of what constitutes a core proceeding is set forth in 28 U.S.C. § 157(b)(2). Noncore proceedings, in contrast, are those causes of action that (1) are not identified as a core proceeding under 28 U.S.C. § 157(b)(2), (2) existed prior to the filing of the bankruptcy case, (3) would continue to exist independent of the provisions of Title 11 of the United States Code, and (4) are not significantly affected as a result of the filing of the bankruptcy case. *Duncan v. Deutsche Nat'l Bank Trust Co.*, No. 11-cv-2006, 2012 WL 4322667, at *3 (N.D. Ohio Sept. 20, 2012) (unpublished) (citing *In re Walton*, 104 B.R. 861, 864 (Bankr. S.D. Ohio 1988)).

Congress has granted bankruptcy judges differing authority depending on whether the claim is "core" or "noncore." 28 U.S.C. § 157. In core proceedings, a bankruptcy judge "may enter appropriate orders and judgments" subject to appellate review by the district court. *Id.* § 157(b)(1). In noncore proceedings, on the other hand, the bankruptcy judge "shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after . . . reviewing de novo" the objections of either party. *Id.* § 157(c)(1).

But parties may waive this limitation on the bankruptcy court's power to adjudicate noncore matters. To that end, the Bankruptcy Code expressly provides that bankruptcy courts may enter final judgments in noncore proceedings "with the consent of all the parties to the proceeding." 28 U.S.C. § 157(c)(2). The bankruptcy court here found that "Count Three is a core proceeding even to the extent that it is predicated on the state-law based objections to the Quick Capital Proof of Claim." *Bavelis*, 453 B.R. at 855. We agree that the bankruptcy court reached the proper conclusion.

As mentioned above, § 157(b)(2) sets forth a nonexhaustive list of core proceedings. Count Three, which the bankruptcy court construed as an objection to Quick Capital's proof of claim, falls under at least two of the examples on that list: (1) the objection involves the "allowance or disallowance of claims against the estate," *see* 28 U.S.C. § 157(b)(2)(B); *see also Bottcher v. Emigrant Mortg. Co., Inc. (In re Bottcher)*, 441 B.R. 1, 3 (Bankr. D. Mass. 2010) ("Although all the plaintiff's causes of action are based on state law, most of them effectively serve as objections . . . to the defendant's proof of claim . . . . Thus, the relief requested . . . fall[s] foursquare within the core jurisdiction of this Court . . . under 28 U.S.C. 157(b)(2)(B) . . . ."); and (2) the resolution of the objection affects the adjustment of the debtor-creditor relationship under 28 U.S.C. § 157(b)(2)(O).

In his reply, Doukas attempts to characterize the issues here as noncore state-law issues, pointing to (1) the importance of the Florida securities laws to the resolution of Count Three, and (2) the bankruptcy court's finding that "the State Law Counts are based entirely on state law, and the court has only related-to jurisdiction over them." But this argument is misguided. The bankruptcy court's reference to "the State Law Counts" has no application to Count Three because the bankruptcy court explicitly distinguished Count Three from "the State Law Counts" (*see, e.g.*, Count Five, which alleges tortious interference, and Count Thirteen, which alleges civil conspiracy). *Bavelis*, 453 B.R. at 855-56.

Although Florida law affects the resolution of each count in Bavelis's complaint, the bankruptcy court's decision to treat Count Three differently was appropriate. The state-law counts and Count Three are dissimilar in that the former (1) are not identified under 28 U.S.C. §§ 157(b)(2)(B)-(N), (2) existed prior to the filing of the bankruptcy case, (3) would continue to

exist independent of the provisions of Title 11 of the United States Code, and (4) are not significantly affected by the filing of the bankruptcy case. *See Nationwide Roofing & Sheet Metal, Inc. v. Cincinnati Ins. Co. (In re Nationwide Roofing & Sheet Metal, Inc.)*, 130 B.R. 768, 774-75 (Bankr. S.D. Ohio 1991) (utilizing the above factors to distinguish between core and noncore proceedings). In contrast, Count Three was construed as an objection to Quick Capital's proof of claim and, therefore, involves the "allowance or disallowance of claims against the estate." *See* 28 U.S.C. § 157(b)(2)(B). Count Three, in other words, is in the nature of an affirmative defense to Doukas's proof of claim, not an independent cause of action. The bankruptcy court thus did not err in deeming Count Three a core proceeding while finding the remaining state-law claims to be noncore.

Furthermore, Doukas's noncore argument is without merit due to the invited-error doctrine. "The doctrine of 'invited error' refers to the principle that a party may not complain on appeal of errors that he himself invited or provoked the court . . . to commit." *Harvis v. Roadway Express Inc.*, 923 F.2d 59, 60-61 (6th Cir. 1991). This circuit has referred to the doctrine as "a cardinal rule of appellate review," and federal appellate courts have applied the doctrine to a "wide range of conduct." *Fryman v. Fed. Crop Ins. Corp.*, 936 F.2d 244, 249 (6th Cir. 1991) (quoting *Harvis*, 923 F.2d at 60) (internal quotation marks omitted)).

In this case, Doukas invited the alleged error by seeking a ruling from the bankruptcy court regarding Bavelis's legal obligations under Florida law. As the BAP aptly put it: "By inviting the bankruptcy court to rule on this issue, . . . Doukas cannot now complain that the bankruptcy court erred in ruling." *Quick Capital*, 2013 WL 6672988, at *18.

## C. Due-process violation

Doukas next argues that the bankruptcy court's decision violates his due-process rights because he claims that "he never had the opportunity to have his day in court" regarding his Florida securities-law claim. Specifically, Doukas argues that the proceedings in the bankruptcy court were insufficient because "the 'trial' was limited in what the court would consider or allow into evidence." But this is the first time that Doukas has raised such an argument in any of the relevant proceedings. Regardless of the merits, Doukas has forfeited his due-process challenge by failing to bring the issue before either of the courts below. *See Scottsdale Ins. Co. v. Flowers*,

513 F.3d 546, 552 (6th Cir. 2008) ("[A]n argument not raised before the district court is waived on appeal to this Court.").

## D. Florida securities-law claim

Given that Doukas has properly challenged the bankruptcy court's ruling on Count Three, we must now review the merits of that issue. Doukas contends that the bankruptcy court erred in two respects: (1) by finding that the Sterling Holding stock sale was exempt from Florida's registration requirements, and (2) by concluding that Doukas's attempt to rescind the purchase was untimely.

### 1. Exemption from Florida's registration requirements

The Florida Securities and Investor Protection Act, codified in Chapter 517 of the Florida Statutes, was designed to protect investors from deceitful practices related to the sale of securities. *Edwards v. Trulis,* 212 So. 2d 893, 895 (Fla. Dist. Ct. App. 1968). Several subsections of Chapter 517 are relevant here. Section 517.07 lays out the registration requirements for the sale of securities, while § 517.061 exempts certain securities from those requirements. If a security does not fall under one of the exemptions of § 517.061, the sale of that security is unlawful unless it has been registered. Fla. Stat. § 517.07. Unlawful sales trigger the remedies set forth in § 517.211. One of those remedies is that "[e]ach person . . . [who] has personally participated or aided in making the sale . . . is jointly and severally liable to the purchaser in an action for rescission." Fla. Stat. § 517.211(1).

One exemption in particular—§ 517.061(11)—is relevant to the analysis here:

The registration provisions of § 517.07 do not apply to any of the following transactions . . . .

(11) (a) The offer or sale, by or on behalf of an issuer, of its own securities, which offer or sale is part of an offering made in accordance with all of the following conditions:

> 1. There are no more than 35 purchasers, or the issuer reasonably believes that there are no more than 35 purchasers, of the securities of the issuer in this state during an offering made in reliance upon this subsection or, if such offering continues for a period in excess of 12 months, in any consecutive 12-month period.

2.  Neither the issuer nor any person acting on behalf of the issuer offers or sells securities pursuant to this subsection by means of any form of general solicitation or general advertising in this state.

3.  Prior to the sale, each purchaser or the purchaser's representative, if any, is provided with, or given reasonable access to, full and fair disclosure of all material information.

4.  No person defined as a "dealer" in this chapter is paid a commission or compensation for the sale of the issuer's securities unless such person is registered as a dealer under this chapter.

5.  When sales are made to five or more persons in this state, any sale in this state made pursuant to this subsection is voidable by the purchaser in such sale either within 3 days after the first tender of consideration is made by such purchaser to the issuer, an agent of the issuer, or an escrow agent or within 3 days after the availability of that privilege is communicated to such purchaser, whichever occurs later.

Fla. Stat. § 517.061(11)(a)(1)-(5).

As the statutory text makes clear, an offer or sale must meet all five of the above conditions in order to trigger the exemption. Doukas does not dispute the applicability of subsections 1, 2, and 4 to the stock transaction here, but he argues that the sale failed to satisfy subsections 3 and 5. Specifically, he argues that Bavelis failed to provide "full and fair disclosure of all material information" in violation of subsection 3, and that the PPM did not comply with subsection 5's rescission provision.

### i. Disclosure of material information

Doukas argues that the condition of § 517.061(11)(a)(3) was not satisfied because he "was not provided information concerning (a) Sterling Holding's financial status, (b) its stock sales, or (c) the FDIC report on the gross negligence of the Sterling Board of Directors." Furthermore, Doukas alleges that the PPM "contained misrepresentations concerning the dollar amount of the shares of stock already subscribed for by the officers and directors of Sterling Bank and Sterling Holding." The PPM stated that Sterling Holding sought to raise $12,600,000 and that "Management believes that the current Board of Directors . . . and employees of the Bank intend to subscribe for a collective total of approximately $7,000,000 of this offering." According to Doukas, however, "[t]he largest, and perhaps, other than the alleged One Million

Dollars ($1,000,000.00) in stock subscribed for by Bavelis, the only person who purchased Sterling Holding stock was Doukas."

Despite Doukas's protests to the contrary, the record in this case establishes that he was "provided with, or given access to, full and fair disclosure of all material information" related to the transaction as required by Florida law. Sterling Holding's disclosures were comprehensive enough to outweigh any suggestion by Doukas that material information was withheld from him. The record shows that several documents supplied Doukas with the pertinent information: (1) the August 7, 2009 letter from Bavelis, (2) a subscription agreement, (3) the PPM prepared by Sterling Holding, and (4) an annual report. The letter from Bavelis acknowledges that while Sterling Bank "has been coping with the troubled loans so far," it "must reserve additional funds for reserves." The PPM, meanwhile, included audited financial statements, disclosures regarding the bank's regulatory issues, and an agreement between the bank, the Federal Reserve, and state regulators regarding the need for the bank to secure additional financial reserves.

In addition to these written notifications, Bavelis testified that both he and his wife warned Doukas of the significant issues facing the bank. The BAP further noted that "any confusion regarding the disclosures regarding how much stock had been sold or was committed to being purchased could have easily been determined. Mr. Doukas had extensive information in hand and nearly unlimited access to additional information from Mr. Bavelis." *Quick Capital*, 2013 WL 6672988, at *22.

In light of these facts, the bankruptcy court did not err in concluding that Doukas had been provided with a full and fair disclosure of all material information. The requirement of § 517.061(11)(a)(3) was thus satisfied.

### ii. *Doukas's right to rescission*

Doukas also argues that the PPM failed to properly notify Doukas of his rescission rights, in violation of § 517.061(11)(a)(5). This contention too is unavailing.

Section 517.061(11)(a)(5) requires a three-day right of rescission for securities purchasers. Doukas argues that the PPM here does not satisfy the requirement of subsection 5 as interpreted by *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp. 1512 (M.D. Fla. 1989). In

*Barnebey*, the rescission provision provided as follows: "If five or more residents of Florida subscribe for Units, each subscription will be voidable by each Florida subscriber within 3 days after submission of his Subscription Agreement to the General Partner." *Id.* at 1530. The subscribers were instructed to mail the subscription agreement to a third party who, in turn, was responsible for seeing that the general partner received the agreement. Thus, the subscribers in *Barnebey* had no way of knowing when the agreement was actually submitted to the general partner, which was the event that triggered the three-day rescission period.

This provision, according to the court in *Barnebey*, failed to comply with § 517.061(11)(a)(5). The court's reasoning focused on the fact that "the statute allows that the time for voiding a purchase run from either the first notice of the privilege or the first tender of consideration," both of which are events known to the purchaser. *Id.* at 1531. *Barnebey* thus stands for the proposition that the intent of subsection 5 "is to provide purchasers with a fixed event from which to calculate the time available for voiding a purchase under the statute." *See Moecker v. Antoine*, 845 So. 2d 904, 908 (Fla. Dist. Ct. App. 2003). Contrary to this principle, the rescission period at issue in *Barnebey* was triggered by an event that was "not one which a plaintiff would necessarily be aware of until after the fact." *Barnebey*, 715 F. Supp. at 1531.

Despite Doukas's assertion, the rescission provision in the Sterling Holding PPM is consonant with the statutory scheme as interpreted by *Barnebey*. The PPM states in relevant part as follows:

> ALL PERSONS PURCHASING SHARES IN FLORIDA HEREUNDER HAVE THE RIGHT, PURSUANT TO SECTION 517.061(11)(a)(5) OF THE FLORIDA SECURITIES ACT, TO WITHDRAW HIS SUBSCRIPTION FOR THE PURCHASE, AND RECEIVE A FULL REFUND OF ALL MONIES PAID, WITHIN THREE (3) DAYS AFTER THE EXECUTION OF THE SUBSCRIPTION AGREEMENT OR PAYMENT FOR THE PURCHASE HAS BEEN MADE, WHICHEVER IS LATER.

The problematic provision in *Barnebey* failed to put subscribers on notice as to when the rescission clock began to run. No such flaw exists in the rescission provision here. Purchasers are clearly notified that the three-day rescission period commences on the later of two dates: (1) when the agreement is executed, or (2) when payment for the purchase is made, whichever is later. Doukas, like others who purchased the Sterling Holding stock, was therefore given a fixed

event from which to calculate the time available for rescission. As a result, the transaction here complied with § 517.061(11)(a)(5).

Because Doukas's purchase of the Sterling Holding stock complied with each of the five conditions of § 517.061(11)(a), that sale was exempt from the registration requirements of § 517.07. The sale was therefore lawful.

### 2. Timely rescission by Doukas

Doukas finally contends that, even if the stock transaction was lawful under Florida's securities laws, the bankruptcy court "did not correctly apply Florida law when it concluded that Doukas' recession [sic] was not timely." Although Doukas couches this argument as alleging a violation of Florida's securities laws, it is, in reality, a contractual claim based on the terms of the PPM.

As discussed above, Florida law guarantees its residents the right to rescind the purchase of exempt securities for three days after either receiving notice of the right to rescind or after the tender of consideration, whichever is later. Doukas received notice of the right to rescind via the PPM that he was sent on September 7, 2009, and he tendered consideration on September 23, 2009. Accordingly, under Florida law, Doukas's right of rescission as guaranteed by state law lapsed on September 26, 2009, long before his attempt to reject the Sterling Holding stock certificate in February 2010. Any claim of rescission that Doukas may have had therefore cannot rest on Florida's securities laws.

The Sterling Holding PPM, however, granted purchasers additional rescission rights. Specifically, it allowed Florida residents to rescind within three days from either the date of the stock purchase or the date the subscription agreement was executed, whichever came later. Doukas contends that because he never executed the subscription agreement, his rescission rights had not commenced (let alone expired) prior to his attempt to void the sale in February 2010.

Such a contractual claim is without merit. As Bavelis correctly points out, he was not a party to Doukas's agreement to purchase the Sterling Holding stock. That agreement was between Sterling Holding and Doukas. Although the Florida Securities and Investor Protection Act would have created personal liability for Bavelis had the securities transaction here been

unlawful (which it was not per the above discussion), no such liability extends to Bavelis for Doukas's contractual claim under the PPM. Doukas is therefore unable to enforce his contractual rights against Bavelis, a nonparty to the contract in question. And even if Doukas could assert such a claim against the Bavelis bankruptcy estate, he failed to do so in a timely manner by failing to file a proof of claim prior to the November 24, 2010 claims-bar deadline established in the main bankruptcy case.

## III.   CONCLUSION

For all the reasons set forth above, we **AFFIRM** the judgment of the BAP.